HEARST-ARGYLE STATIONS, INC., d/b/a WISN-TV,
Channel 12 and f/k/a Hearst Corporation, a Dela-
ware Corporation, Plaintiff-Appellant,

v.

BOARD OF ZONING APPEALS OF THE CITY OF MILWAUKEE,
a Wisconsin municipal quasi-judicial body,
Defendant-Respondent.

Court of Appeals

*No. 02–0596. Oral argument November 5, 2002.—Decided
February 4, 2003.*

2003 WI App 48

(Also reported in 659 N.W.2d 424.)

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Matthew J. Flynn, James H. Baxter III*, and *Christina D. Hernandez-Malaby* of *Quarles & Brady, LLP*, of Milwaukee, with oral argument by Matthew J. Flynn.

On behalf of the defendant-respondent, the cause was submitted on the brief of *Grant F. Langley*, city attorney, and *Thomas O. Gartner*, assistant city attorney.

Before Wedemeyer, P.J., Schudson and Curley, JJ.

¶ 1. CURLEY, J. Hearst-Argyle Stations, Inc. (Hearst) appeals from the trial court's order affirming the decision of the Board of Zoning Appeals for the City of Milwaukee (BOZA), which denied Hearst's zoning permit application to top-mount a digital television (DTV) antenna on its existing transmission tower,

thereby increasing the height of its tower by 115 feet. Hearst contends that BOZA improperly denied its application because: (1) Hearst satisfied the special use standard by establishing that its DTV antenna is "necessary for the public convenience at a particular location"; (2) BOZA improperly applied the variance standard to its application; (3) BOZA's determination is preempted by Federal Communications Commission (FCC) directive; (4) BOZA's denial of its application was arbitrary and unsupported by the evidence; and (5) BOZA denied its application based on prejudice and bias. We disagree and affirm the trial court's order, and therefore, BOZA's decision.

## I. BACKGROUND.

¶ 2. The FCC issued a directive requiring all television-broadcasting stations to begin broadcasting DTV signals to its current broadcast area by May 1, 2002.[1] After a transition period tentatively scheduled to end in 2006, the FCC will require television-broadcasting stations to cease transmitting their present analog television signals and begin broadcasting only DTV signals, because DTV technology provides a clearer, crisper television image than analog television technology. However, unlike an analog television signal, whose interference results in fuzzy reception, if the DTV signal is interfered with, there is a "cliff effect," which completely eliminates reception.

¶ 3. Hearst owns and operates television-broadcasting stations, including WISN-TV, Channel 12, Milwaukee's ABC affiliate. Hearst has a 1106–foot-high-television-transmission tower at the top of which

---

[1] Hearst received an extension from the FCC to October 1, 2002.

is currently mounted an analog television antenna. On July 31, 1997, deciding to comply with the FCC's directive by top-mounting the DTV antenna rather than temporarily side-mounting the antenna, Hearst petitioned BOZA for permission to construct a 116–foot addition to its existing tower for the purpose of mounting a DTV antenna on top of the existing analog antenna. Hearst submitted an application seeking both a special use and a variance. The special use was required to permit the proposed height extension. The variance was required to accommodate the installation of supplemental anchor points for the tower.

¶ 4. BOZA, a Wisconsin municipal quasi-judicial body established and operated pursuant to WIS. STAT. § 62.23(7)(e),[2] has the authority to hear and decide applications for special use and variance zoning permits. Although BOZA has the authority to interpret the zoning ordinances, only the City's Common Council has the authority to enact zoning ordinances. On March 21, 1997, the Common Council approved a Transmission Tower Policy Statement. The resolution approving the Tower Policy directed BOZA to be guided by the policy in making decisions on the placement of transmission towers within the City of Milwaukee. The stated goal of the Tower Policy was to prevent the proliferation of transmission towers and to ensure that towers are

---

[2] WISCONSIN STAT. § 62.23(7)(e)1 (1999–2000) states, in relevant part:

> The council which enacts zoning regulations pursuant to this section shall by ordinance provide for the appointment of a board of appeals, and shall provide in such regulations that said board of appeals may, in appropriate cases and subject to appropriate conditions and safeguards, make special exceptions to the terms of the ordinance in harmony with its general purpose and intent and in accordance with general or specific rules therein contained.

designed to accommodate multiple users in order to reduce the total number of towers over time. The Tower Policy is not part of the Milwaukee Code of Ordinances, but rather, sets forth land use and planning policy objectives.

¶ 5. On November 1, 1997, after Hearst had filed its application, but before BOZA had made a decision, the Common Council enacted an amendment to the zoning ordinances (Tower Amendment) that imposed stringent height restrictions on transmission towers in accordance with the stated objectives of the Tower Policy. The Tower Amendment would have foreclosed the special use permit sought by Hearst.[3] But, in fairness, BOZA ruled that although it could rely on the Tower Policy for guidance, it could not apply the Tower Amendment to Hearst's application, because Hearst had filed its application for a permit prior to the effective date of the amendment.

¶ 6. The application originally submitted by Hearst on July 31, 1997 was modified several times. On April 30, 1999, Hearst submitted revised plans indicating that it had eliminated the need for new anchor points, thereby, eliminating the need for a variance. On May 10, 1999, Hearst submitted another revised plan indicating that the height extension would be 115 feet rather than 116 feet.

¶ 7. On May 27, 1999, BOZA conducted a public hearing on Hearst's revised application. Relying on the Tower Policy, BOZA denied the proposed tower height increase. BOZA determined that the increase was not

---

[3] Had BOZA applied the Tower Amendment, Hearst would have only been eligible for the more difficult to obtain variance for the tower extension.

necessary for the "public convenience," one of the then-existing special use requirements.

¶ 8. On August 27, 1999, BOZA issued a written decision denying Hearst's application for a special use permit. Hearst sought certiorari review of BOZA's initial decision. On August 6, 2001, Milwaukee County Circuit Court Judge Elsa C. Lamelas issued an order reversing BOZA's decision and remanding the matter to BOZA for further proceedings not inconsistent with her order. In reversing BOZA's initial decision and remanding the matter to BOZA, Judge Lamelas believed that BOZA rejected the application based on the Tower Policy alone, and thus essentially applied the Tower Amendment.

¶ 9. On October 4, 2001, BOZA reconvened and conducted further proceedings with respect to Hearst's application. BOZA denied the application for a second time, and issued a written decision on November 7, 2001. BOZA determined that top-mounting the DTV antenna with a 115–foot extension on top of its current tower was not necessary for the public convenience. BOZA reasoned that Hearst could either install their DTV antenna on another tower or side-mount the DTV antenna on its own tower until the top-mounted analog antenna could be removed, as it would no longer be needed, and then top-mount its DTV antenna on its own tower.

¶ 10. After the October vote to deny its application, Hearst commenced two actions seeking both mandamus and certiorari relief. Hearst alleged that it was entitled to relief because BOZA's decision was, among other reasons, arbitrary, capricious, unreasonable, an erroneous exercise of discretion, unsupported by the evidence, motivated by improper bias, and prejudicial. On February 12, 2002, Milwaukee County Circuit Court

Judge William J. Haese issued an order concluding that Hearst was not entitled to mandamus or certiorari relief.[4]

## II. ANALYSIS.

■■■■

¶ 11. Hearst claims that the trial court erred in concluding it is not entitled to either mandamus or certiorari relief. WISCONSIN STAT. § 62.23(7)(e)10 authorizes trial court review by certiorari of the decisions of BOZA.[5] It is well-settled that the common-law certiorari standard of review applies to a circuit court's review under § 62.23(7)(e)10 when, as here, the trial court does not take evidence. *See Klinger v. Oneida County*, 149 Wis. 2d 838, 843, 440 N.W.2d 348 (1989). Under the common-law certiorari standard to review

---

[4] Although Judge Haese concluded that BOZA only paid "lip service" to Judge Lamelas' order, he nevertheless concluded that Hearst was not entitled to mandamus or certiorari relief.

[5] WISCONSIN STAT. § 62.23(7)(e)10 (1999–2000) states:

> Any person or persons, jointly or severally aggrieved by any decision of the board of appeals, or any taxpayer, or any officer, department, board or bureau of the municipality, may, within 30 days after the filing of the decision in the office of the board of appeals, commence an action seeking the remedy available by certiorari. The court shall not stay proceedings upon the decision appealed from, but may, on application, on notice to the board of appeals and on due cause shown, grant a restraining order. The board of appeals shall not be required to return the original papers acted upon by it, but it shall be sufficient to return certified or sworn copies thereof. If necessary for the proper disposition of the matter, the court may take evidence, or appoint a referee to take evidence and report findings of fact and conclusions of law as it directs, which shall constitute a part of the proceedings upon which the determination of the court shall be made. The court may reverse or affirm, wholly or partly, or may modify, the decision brought up for review.

BOZA's denial of a variance or special use permit application, review is limited to "(1) whether the board kept within its jurisdiction; (2) whether it proceeded on a correct theory of law; (3) whether its action was arbitrary, oppressive or unreasonable and represented its will and not its judgment; and (4) whether the evidence was such that it might reasonably make the order or determination in question." *State ex rel. Brookside Poultry Farms, Inc. v. Jefferson County Bd. of Adjustment*, 131 Wis. 2d 101, 120, 388 N.W.2d 593, 600 (1986) (citation omitted).

¶ 12. "On appeal from a circuit court order or judgment entered on certiorari, an appellate court does not review the judgment or findings of the circuit court but rather reviews the record of the Board to which certiorari is directed." *Klinger*, 149 Wis. 2d at 845 n.6. Thus, we will not address the question of whether the trial court made the right decision, but rather, whether BOZA's decision was reached properly. *See County of Sawyer Zoning Bd. v. DWD*, 231 Wis. 2d 534, 538, 605 N.W.2d 627 (Ct. App. 1999).

¶ 13. "When *certiorari* is invoked to review the action of an administrative board, the findings of the board upon the facts before it are conclusive if in any reasonable view the evidence sustains them." *State ex rel. Morehouse v. Hunt*, 235 Wis. 358, 367, 291 N.W. 745 (1940). Accordingly, we will not reverse BOZA's decision if "reasonable minds could arrive at the same conclusion reached by the administrative tribunal." *Brookside Poultry Farms*, 131 Wis. 2d at 120.

¶ 14. With respect to Hearst's prayer for mandamus relief, the trial court's decision should be upheld unless it erroneously exercised its discretion. *See Miller v. Smith*, 100 Wis. 2d 609, 621, 302 N.W.2d 468 (1981). A party seeking a writ of mandamus must show:

> (1) the writ is based on a clear, specific legal right which is free from substantial doubt; (2) the duty sought to be enforced is positive and plain; (3) substantial damage will result if the duty is not performed; and (4) there is no other adequate remedy at law.

*State ex rel. Iushewitz v. Milwaukee County Pers. Review Bd.*, 176 Wis. 2d 706, 711, 500 N.W.2d 634 (1993). Applying either the mandamus or certiorari standard of review, BOZA's decision denying Hearst's application must be affirmed.

*A. BOZA's decision denying Hearst's application for a special use permit was reasonable.*

■

¶ 15. A special use permit is one that the zoning code allows under certain conditions. *See Delta Biological Res., Inc. v. Board of Zoning Appeals*, 160 Wis. 2d 905, 910, 467 N.W.2d 164 (Ct. App. 1991).

> A special use permit allows a property owner to put his or her property to a use expressly permitted by the zoning ordinance, but only if certain conditions are met. Special uses are tools of municipal planning. They have been used to cope with situations which arise when a use, though consistent with the use classification of a particular zone, nevertheless creates special problems or hazards if allowed to develop and locate as a matter of right.

*Id.* at 910–11 (citations omitted).

¶ 16. Milwaukee Code of Ordinances § 295–59–5-b provides[6]:

> b. Special Uses. No special use shall be granted unless the board finds the following facts and conditions exist, and so indicates in the minutes of its proceedings:
>
> b-1. Necessity for Public Convenience. The use is necessary for the public convenience at a particular location.
>
> b-2. Protection of Public Health, Safety and Welfare. The use is designed, located and operated in a manner so that the public health, safety and welfare is protected.
>
> b-3. Protection of Property. The use will not impact adversely on adjoining property or the neighborhood in general.

¶ 17. The burden of proof is placed on the party seeking a special use exception permit. *See Anderson v. Anderson*, 147 Wis. 2d 83, 88, 432 N.W.2d 923 (Ct. App. 1988). Hence, Milwaukee Code of Ordinances § 295–59–5-b placed in Hearst's hands "the laboring oar to prove that it met the conditions for its proposed use under the ordinance." *Delta Biological Res.*, 160 Wis. 2d at 913. BOZA's conclusion that Hearst failed to carry this burden is reasonably supported by the record.

¶ 18. The term "necessary for the public convenience" has not been defined by either the Milwaukee County Ordinances or the Wisconsin Statutes, and no appellate court in Wisconsin has interpreted the phrase. Breaking down this rather stilted phrase and giving each term its common and reasonable meaning,

---

[6] Reference to § 295–59–5-b of the Milwaukee Code of Ordinances is to the 6/25/96 version.

"necessary" means "whatever is essential for some purpose . . . that cannot be done without." WEBSTER'S THIRD NEW INT'L DICTIONARY, 1510 (1993). "Public" means "the people as an organized community . . . distinguished by common interests or characteristics." *Id.* at 1836. Finally, "convenience" means "a favorable or advantageous condition . . . that provides comfort or advantage . . . conducive to personal ease or comfort." *Id.* at 497. Thus, we conclude that "necessary for the public convenience" means that in order for BOZA to approve Hearst's special use permit, Hearst had to present sufficient evidence that its tower extension was essential to the community as a whole. Accordingly, we must decide whether Hearst proved that top-mounting its DTV antenna on its existing tower was essential for favorable television viewing for the community in question as compared with the burden placed on the community by the antenna.

¶ 19. In its written decision on November 7, 2001, BOZA decided that Hearst failed to establish that the extension was necessary for the public convenience:

> [T]he Board of Zoning Appeals determined that even if the Board had determined [Hearst's] application to be considered a special use because [Hearst] had vested rights, the Board found that a special use could not be approved because [Hearst] did not demonstrate that the extension was necessary for the public convenience. In accordance with Judge Lamelas' instructions, the Board clarified and concluded that even without consideration of the Common Council Tower Policy or Tower Amendment, the criteria that requires [sic] necessity for the public convenience is not satisfied . . . . [A]lternatives exist for complying with the FCC mandate without an extension or placing [the DTV antenna] on another tower. [The DTV] broadcasting sys-

507

tem could be [side][-]mounted to the existing tower without constructing a 115[-]foot extension.

BOZA ultimately concluded that Hearst did not prove it was essential to the public good that Hearst top-mount its DTV antenna because it could side-mount the antenna and still reach 99.5 percent of the potential viewing population within the City of Milwaukee, and ninety-eight percent of the potential viewing population outside of the City of Milwaukee in the periphery of Channel 12's service area.

¶ 20. Hearst argues that BOZA's suggestion of side-mounting until 2006 is not a viable option because "there will be a loss of service to thousands of Milwaukee residents and additional thousands of residents of various communities around the periphery of Hearst's Channel 12 service area if Hearst is forced to side-mount on its own tower or another tower." Thus, Hearst concludes that BOZA improperly analyzed the evidence in support of its denial of a special use permit. We disagree. More than adequate evidence supported the viability of side-mounting the antenna or using another tower until Hearst could top-mount its DTV antenna. Thus, we conclude that BOZA acted reasonably when it concluded that top-mounting Hearst's DTV antenna is not "necessary for the public convenience at a particular location."[7]

¶ 21. Joseph Davis, Hearst's own expert, testified that the potential impact on Channel 12 viewers in the event that Hearst side-mounted the DTV antenna on its own tower was minimal:

---

[7] We need only address the first of the three requirements for a special use permit; i.e., whether the use is necessary for the public convenience at a particular location, because BOZA conceded that Hearst met the second and third requirements.

[BOZA:] Would the City of Milwaukee residents lose any coverage?

[DAVIS:] It's not a matter of lack of signal level or power level at that spot but rather the impact of side[-]mounting as it may increase the number of errors that the receiver has to correct for, and it's entirely possible and probable that that there will be some locations within Milwaukee that may be shadowed slightly because of a tall building, or they may have some other obstruction or impairment, whether it's interference or local noise or the effect of the side[-]mounting . . . .

. . . .

[BOZA:] For 99.5 percent of the population, if it's side[-]mounted in the City of Milwaukee, will it work?

[DAVIS:] The difference between side[-]mounting and top[-]mounting within the City of Milwaukee is probably going to be in that order, that's correct.

¶ 22. Both Joel Levy and Louis DuTreil, two other expert witnesses, testified that Hearst could eventually serve one hundred percent of its population by top-mounting the DTV antenna in place of the analog antenna once the analog signal has been phased out and broadcasting will be done entirely on DTV. DuTreil further testified that until the point of transition when Hearst could remove its analog antenna and top-mount its DTV antenna, it would experience a maximum loss of service of only two percent to digital viewers by side-mounting the DTV antenna.[8]

---

[8] During this transition period, stations will operate with two channels, one for DTV (digital television) and one for TV (analog television). The FCC directive currently requires stations to eliminate analog use by 2006. Therefore, Hearst could top-mount the DTV antenna no later than 2006, or whenever

509

¶ 23. BOZA weighed this evidence and found that a side-mounted DTV antenna on Hearst's present tower would reach 99.5 percent of its viewing population in the City of Milwaukee – a loss of .5 percent or approximately 3,000 viewers.[9] Further, BOZA found, and Hearst concedes, that viewers outside of the City of Milwaukee in the periphery of Channel 12's service area would experience a maximum loss of two percent.[10] We

the majority of viewers are capable of receiving a digital signal. Once analog use is completely eliminated, the side-mount may be removed.

[9] 2000 United States Census Bureau data shows that the population of the City of Milwaukee is 596,974. Thus, a .5 percent loss in the City of Milwaukee would result in approximately 2,985 viewers.

[10] In its main brief, Hearst concedes a one to two percent loss in the City of Milwaukee as well as on the periphery. Again, in oral argument to this Court, Hearst acknowledged that although it believed the potential loss to be greater, the evidence and expert testimony supported these figures.

Despite Hearst's own admission that "it is undisputed that there will be a loss of service to [ ] various communities around the periphery," and its concession that expert testimony established "the loss around the perimeter of Hearst's viewing area is 'one to two percent,' " the dissent insists that BOZA failed to consider this effect on the periphery. The dissent relies on two quotations from the BOZA chairman at the November 20, 1997 hearing, in which BOZA focused the attention of the discussion to the effect on the City of Milwaukee exclusively. However, the dissent has apparently ignored BOZA's October 4, 2001 oral decision – the proceedings held after the matter was remanded from the circuit court. There, Board Member Winkler stated: "[T]he expert testimony that I've reviewed in the transcripts was that Channel 12 would lose, at most, a percentage or two percentage points of its viewing, *its geographical*

cannot agree with Hearst that this loss is so great as to create a "public inconvenience," such that top-mounting rather than side-mounting "is necessary for the public convenience at a particular location." Accordingly, BOZA's decision was not arbitrary, oppressive, or unreasonable, and will be affirmed. Hearst currently owns a tower over 1000 feet high. Its request for a 115–foot extension, given the small percentages of viewers affected, was unwarranted.[11] Thus, we are satisfied that a

_viewing area_, if it were required to side mount." (Emphasis added.) He then concluded that this loss was nominal and insufficient to constitute a public inconvenience. As admitted by Hearst, the expert testimony relied upon addressed the entire Channel 12 geographical viewing area. Therefore, BOZA was well aware of the impact on the geographical viewing area beyond the City of Milwaukee in its decision. BOZA implicitly incorporated Hearst's entire geographical area into its decision by relying on expert testimony discussing the impact on the viewers outside the City of Milwaukee, and Hearst itself concedes the evidence established a "loss around the perimeter of Hearst's viewing area [of] 'one to two percent.' "

Moreover, Hearst has conceded that the effect on the City of Milwaukee and the periphery is nearly identical – one to two percent of viewers in both categories may be deprived of service during side-mounting. Thus, because the effects on the periphery are no greater than on the City, we find the dissent's debate a completely academic exercise.

Therefore, although Hearst contends that "community" _must_ include not only the City of Milwaukee, but also the various communities outside of the city but on the periphery of Channel 12's service area, because BOZA did account for the effect of its decision on the periphery communities, we will leave the issue for another day; i.e., whether a municipal board with jurisdiction over a defined area _must_ consider the effects of its decision on communities lying outside that area.

[11] The dissent is apparently offended that we determined the issue without going into all the issues that the dissent sees

.5 to two percent loss of viewers, until the time when top-mounting and 100 percent replication of viewership is feasible, does not seem so egregious as to create a public inconvenience.

## B. *Hearst fails to establish that BOZA improperly applied the variance standard.*

¶ 24. Because we have already concluded that BOZA's denial of Hearst's application based on the special use standard is sufficient to sustain its denial of

festering beneath the surface. This is actually a very simple case. BOZA, a board made up of concerned citizens, exercised its discretion and found the small percentages involved in what is a temporary situation did not rise to the level of creating a "public inconvenience." While the dissent wishes to micromanage BOZA, BOZA is entitled to exercise its discretion. The dissent also decries our failure to give a precise number of viewers that would be needed to reach a "public inconvenience" of what is essentially a temporary period of approximately three years. We will not decide what level of loss in viewership would create a public inconvenience because we refuse to address hypothetical facts. *See Pension Mgmt., Inc. v. DuRose*, 58 Wis. 2d 122, 128, 205 N.W.2d 553 (1973) (stating that appellate courts will not decide issues based on hypothetical facts). The issue presented has been answered; *i.e.*, whether a potential maximum loss of .5 to two percent of viewers in Channel 12's geographical viewing area creates a public inconvenience. Thus, we need not entertain the question of how many viewers would be needed to create a public inconvenience.

The dissent goes on to complain that we failed to explore Judge Haese's comment that BOZA paid "lip service" to Judge Lamelas's directive on remand. As we explained, we review BOZA's decision, not Judge Haese's, who ruled in favor of BOZA.

Hearst's permit, the following analysis is provided only to address a number of the arguments raised by both parties in their briefs.

¶ 25. A variance permit allows a property owner to use his or her property in a manner that is otherwise prohibited by a zoning ordinance because not being able to do so would create an "unnecessary hardship." *See Waukesha v. Town Bd. of Waukesha*, 198 Wis. 2d 592, 604, 543 N.W.2d 515 (Ct. App. 1995). "Unnecessary hardship" is created where, in the absence of a variance, no feasible use could be made of the land, the condition affecting the parcel is unique, and the variance will not be contrary to public interest. *See State v. Winnebago County*, 196 Wis. 2d 836, 843, 540 N.W.2d 6 (Ct. App. 1995).

¶ 26. "As a general rule, variances are subclassified into 'use' variances and 'area' variances." *State v. Ozaukee County Bd. of Adjustment*, 152 Wis. 2d 552, 559, 449 N.W.2d 47 (Ct. App. 1989). "While 'use' variances govern the purposes to which land and structures are put, 'area' variances govern size and shape of land and structures . . . ." *Id.* at 560.

¶ 27. "When considering a variance request, the zoning authority is to make a discretionary call on a case-by-case basis as to whether, and if so by how much, the governing rules are to be relaxed." *Miswald v. Waukesha County Bd. of Adjustment*, 202 Wis. 2d 401, 412, 550 N.W.2d 434 (Ct. App. 1996). Whether a variance should be authorized in a particular case is to be determined by BOZA in exercise of its discretion, and if it acts within the powers conferred upon it and its

action is not arbitrary or capricious, there is no violation of the property owner's constitutional rights. *State ex rel. Schleck v. Zoning Bd. of Appeals*, 254 Wis. 42, 52, 35 N.W.2d 312 (1948). That we might have reached a different conclusion does not render arbitrary or capricious BOZA's decision refusing to grant the variance. *See id.*

¶ 28. However, where substantial rights have vested, zoning ordinances cannot be applied retroactively. *See County of Sauk v. Trager*, 113 Wis. 2d 48, 56, 334 N.W.2d 272 (Ct. App. 1983). "A vested right is the right to initiate or continue the establishment of a use or construction of a structure which, when completed, will be contrary to the restrictions or regulations of a recently enacted zoning ordinance." 4 EDWARD H. ZIEGLER, JR., *Rathkopf's The Law of Zoning and Planning*, § 70:2 (4th ed. 1956 & Supp.1994). Therefore, even if the variance standard would normally apply, if a party were able to establish "vested rights," the special use standard rather than the variance standard would apply. *See generally Lake Bluff Hous. Partners v. City of South Milwaukee*, 197 Wis. 2d 157, 540 N.W.2d 189 (1995).[12]

¶ 29. In reaching its decision, BOZA found that Hearst had not established vested rights. But BOZA went ahead and also applied the variance standard and concluded that Hearst failed to satisfy the criteria

---

[12] The theory behind the vested rights doctrine is that a property owner is proceeding on the basis of a reasonable expectation that his or her modification of the property is in compliance with then-existing zoning codes. *See State ex rel. Cities Serv. Oil Co. v. Board of Appeals*, 21 Wis. 2d 516, 528–29, 124 N.W.2d 809 (1963).

necessary for a zoning variance.[13] Hearst does not challenge BOZA's conclusion that it failed to satisfy the variance criteria. Rather, Hearst challenges BOZA's application of the variance standard, claiming that application of the variance standard "violated Judge Lamelas' orders and the controlling law." Hearst misinterprets Judge Lamelas's order – Hearst reads the August 6, 2001 order as directing BOZA *only* to apply the special use standard. We disagree with Hearst's interpretation and conclude that while the order in

[13] Milwaukee Code of Ordinances § 295–59–5 (amended 7/17/01) states:

VARIANCES

. . . .

c. Findings. No variance shall be granted unless the board, after due notice to the parties of interest, finds that the following facts and conditions exist, and so indicates in the minutes of its proceedings or its decision:

c-1. Preservation of Intent. A variance would not be inconsistent with the spirit, purpose and intent of the regulations for the district in which it is requested.

c-2. Exceptional Circumstances. Exceptional, extraordinary or unusual circumstances or conditions apply to the lot or intended use that do not apply generally to other properties or uses in the same district, and the variance is not of so general or recurrent nature to suggest amendment of the regulation.

c-3. Preservation of Property Rights. The variance is necessary for the preservation and enjoyment of the same substantial property rights which are possessed by other properties in the same district and same vicinity.

c-4. Absence of Detriment. The variance will not create substantial detriment to adjacent property, and will not materially impair or be contrary to the spirit, purpose and intent of this chapter, or the public interest.

c-5. Hardship. The alleged difficulty or hardship is not self-imposed nor is it based solely on economic grounds.

question directed BOZA to apply the special use standard properly, i.e., without undue reliance on the Tower Policy, it did not *preclude* application of the variance standard.

¶ 30. Judge Lamelas' August 6, 2001 order states, in relevant part:

> While Hearst's application was filed after the Tower Policy was enacted, it was filed **before** the Tower Amendment implementing the policy became effective. The Board did not make a clear determination on the record as to whether the old standard for granting a special use permit, or the new standard, the Tower Amendment, was the appropriate standard to be applied to Hearst's application.
>
> . . . .
>
> It is clear in its decision, however, that the Board did justify denial of Hearst's application based upon the Tower Policy alone. In fact, the Board so overwhelmingly relied on the Tower Policy that it treated Hearst's application as though the Tower Amendment was the controlling and applicable ordinance.
>
> . . . .
>
> Since the Board used the Tower Policy as the sole reason for the denial, it actually considered Hearst's application in light of the amended zoning ordinance, the ordinance that the Board itself had indicated did not apply. Therefore, the Board's denial was arbitrary and represented imposition of its own judgment, not the standards of a special use permit.

(Emphasis in original.)

¶ 31. Thus, contrary to Hearst's assertion, there was no clear direction for BOZA to apply the special use

516

standard *exclusively.* The order never even mentions the variance standard or its application. Rather, Judge Lamelas merely directed BOZA to apply the special use standard properly – without undue reliance on the Tower Policy. Therefore, we read Judge Lamelas's decision as asking BOZA to make its decision without applying the Tower Amendment, by undue reliance on the Tower Policy, and to explain the other factors that influenced its decision. In any event, BOZA's decision on the special use request obviates the need to discuss its variance decision in depth.[14] Accordingly, we conclude that BOZA did not erroneously exercise its discretion in denying Hearst's application.

*C. The zoning code has not been preempted by FCC directive.*

¶ 32. Lastly, Hearst claims that the FCC directive preempts the zoning ordinances in question, because the zoning ordinances will impair Channel 12's signal and frustrate the FCC's directive to broadcast DTV exclusively by 2006. Hearst has knocked on the wrong door. Certiorari and mandamus actions are not proper avenues to pursue such a declaration of rights. *Kaiser v. City of Mauston*, 99 Wis. 2d 345, 355, 299 N.W.2d 259 (Ct. App. 1980) (stating that a declaratory judgment action was the proper method of challenging the valid-

---

[14] Because Hearst first discusses the issues of equal protection, the application of Milwaukee Ordinance § 295-5-5, the doctrine of issue preclusion, vested rights, and the zoning variance criteria in its reply brief, those issues are beyond our reach. *See Swartwout v. Bilsie*, 100 Wis. 2d 342, 346 n.2, 302 N.W.2d 508 (1981) (stating that if an appellant fails to discuss an alleged error in its main brief, it may not do so in the reply brief).

ity of an ordinance creating a lake improvement district), *overruled on other grounds by DNR v. City of Waukesha*, 184 Wis. 2d 178, 191, 515 N.W.2d 888 (1994); *see also* WIS. STAT. § 806.04(2). Hearst may well wish to bring a declaratory judgment action naming the City of Milwaukee and seeking a declaration that the application of the zoning ordinances is preempted by the FCC directive. *See, e.g., City News and Novelty, Inc. v. City of Waukesha*, 170 Wis. 2d 14, 487 N.W.2d 316 (Ct. App. 1992). However, that cause of action is not properly before us.

¶ 33. Based on the foregoing, we conclude that BOZA's denial of Hearst's application was supported by the evidence, and was not arbitrary or based on prejudice. Accordingly, the trial court, and therefore BOZA's decision, is affirmed.

*By the Court.*—Order affirmed.

¶ 34. SCHUDSON, J. (*dissenting*). I am unable to join the majority because, in my estimation, its opinion (1) addresses an issue it should not; (2) fails to adequately analyze the issue it must; and (3) incorrectly accepts the City's assertion—an assertion belied by the record—that BOZA considered the "public convenience" of television viewers living outside the city limits. Because the record fails to establish that BOZA considered the "public convenience" of viewers outside the city limits, and because the City concedes that BOZA was required to do so, we must remand.

I.

¶ 35. The majority explains that because Hearst determined that it did not need to install supplemental anchor points to increase the height of its tower, it did

not pursue its initial request for a variance. *See* majority at ¶¶ 3, 6. The majority acknowledges that Hearst "does not challenge BOZA's conclusion that it failed to satisfy the variance criteria." *Id.* at ¶ 29. And the majority concludes that "BOZA's denial of Hearst's application based on the special use standard is sufficient to sustain its denial of Hearst's permit." *Id.* at ¶ 24.

¶ 36. Why, then, does the majority discuss variance law? *See id.* at ¶¶ 25–31. The majority says it does so "only to address a number of the arguments raised by both parties in their briefs." *Id.* at ¶ 24. But the majority fails to do so. Instead, obfuscating the variance issue that may be lurking in this case, the majority does not even mention the competing MATC tower, discuss its significance, or really recognize Hearst's argument —that BOZA's invocation of the variance criteria was nothing more than a pretext paying what Judge Haese termed "lip service" to Judge Lamelas' ruling that BOZA's denial of Hearst's application "was arbitrary and represented its will and not its judgment."

## II.

¶ 37. The majority recognizes that the central issue in this case is whether Hearst established, under Milwaukee Code of Ordinances § 295–59–5-b-1, that increasing the height of its tower to comply with the FCC's DTV-signal directive "is necessary for the public convenience." *See* majority at ¶¶ 16–17. According to the record, BOZA's denial of a special-use permit to do so would remove Channel 12 access from between at least one-half of one percent and two percent of Hearst's viewers within the city limits (a loss to between 2,985 and 11,940 viewers), and between one and two percent of Hearst's viewers beyond the city limits.

519

¶ 38. The majority then, without a single legal reference, writes, "We cannot agree with Hearst that this loss is so great as to create a 'public inconvenience,' such that top-mounting rather than side-mounting 'is necessary for the public convenience at a particular location.' " *Id.* at ¶ 23. Why? Under what legal standard? At what number—how many thousands of viewers without Channel 12 television service—would the majority draw the line? The majority simply does not say.

## III.

¶ 39. It is undisputed that the denial of Hearst's special-use permit to increase the height of its tower will result in the loss of Channel 12 access for thousands of viewers—both inside and outside the City of Milwaukee. Whether, in reviewing Hearst's special-use request, BOZA was required to consider the interests of citizens outside the city limits might be an interesting issue. In this case, however, that potential issue dissolved because the City conceded that such consideration was necessary. Significantly, however, the record fails to establish that BOZA took non-city residents into account.

¶ 40. At oral argument before this court, the City did indeed concede that BOZA, in determining whether Hearst's requested special use was "necessary for the public convenience," had to consider the Channel 12 viewers beyond the city limits. The majority, however, incorrectly insists that BOZA did so.

¶ 41. The majority asserts that "BOZA *did account for the effect of its decision on the periphery communities.*" *Id.* at ¶ 23 n.10 (emphasis added). To support its assertion, however, the majority relies not

520

on BOZA's findings or conclusions, but rather, on *Hearst's contentions* about the loss of viewers outside the city as well as evidence supporting those contentions. *See id.* The majority then refers to a BOZA member's comments about the "geographical viewing area" to reach its conclusion that BOZA "*implicitly* incorporated Hearst's entire geographical area into its decision." *Id.* (emphasis added). The record, however, suggests otherwise.

¶ 42. As Hearst's counsel specifically referenced at oral argument, the BOZA chairman, two times, clarified that BOZA's determination must focus on the "public convenience" of *city* residents. At one point the chairman declared: "But what this board's role is is to determine based on the standard what's best for this community. *Based for the City of Milwaukee viewership . . . .*" (Emphasis added.) Later, the chairman added, "Let's again talk about *the City of Milwaukee because that's what's before us.*" (Emphasis added.) Thus, the chairman set the boundary for BOZA's analysis and, given that *explicit* boundary, neither *Hearst's contentions,* nor the evidence supporting them, nor a BOZA member's passing reference to the "geographical viewing area" moved the analysis, *implicitly* or otherwise, beyond the city limits.

¶ 43. Hearst offers compelling arguments in support of its contention that BOZA, "once again improperly focused on its own policy rationale for its prior decision to grant MATC's application, rather than . . . on the applicable ordinance standard." Deciding this appeal on its narrowest possible ground, however, *see State v. Blalock*, 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989) ("cases should be decided on the narrowest possible ground"), we, at the very least, should remand to require BOZA to do exactly what the City

concedes it must: evaluate whether Hearst's special-use request should be granted, giving full consideration to all Channel 12 viewers regardless of whether they reside inside or outside the city limits. Accordingly, I respectfully dissent.