2024 WI App 43

**COURT OF APPEALS**
**DECISION**
**DATED AND FILED**

**July 18, 2024**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

| | |
|---|---|
| **Appeal Nos. 2023AP78**<br>**2023AP1339** | **Cir. Ct. No. 2021CV162** |
| **STATE OF WISCONSIN** | **IN COURT OF APPEALS**<br>**DISTRICT IV** |

BUDDY J. SAVICH AND JANEL M. SAVICH,

    PLAINTIFFS,

SBA STRUCTURES, LLC,

    PLAINTIFF-RESPONDENT,

  V.

COLUMBIA COUNTY BOARD OF ADJUSTMENT AND
COLUMBIA COUNTY PLANNING & ZONING DEPARTMENT,

    DEFENDANTS-APPELLANTS,

AT&T MOBILITY,

    DEFENDANT,

TILLMAN INFRASTRUCTURE LLC, CHRIS MCNICOL
AND ROBIN MCNICOL,

    DEFENDANTS-CO-APPELLANTS.

BUDDY J. SAVICH,

PLAINTIFF-RESPONDENT-CROSS-APPELLANT,

SBA STRUCTURES, LLC,

PLAINTIFF-RESPONDENT,

JANEL M. SAVICH,

PLAINTIFF,

V.

COLUMBIA COUNTY BOARD OF ADJUSTMENT AND
COLUMBIA COUNTY PLANNING & ZONING DEPARTMENT,

DEFENDANTS-CO-APPELLANTS-CROSS-RESPONDENTS,

TILLMAN INFRASTRUCTURE LLC, AT&T MOBILITY,
CHRIS MCNICOL AND ROBIN MCNICOL,

DEFENDANTS-APPELLANTS-CROSS-RESPONDENTS.

APPEALS and CROSS-APPEAL from orders of the circuit court for Columbia County: TODD J. HEPLER, Judge. *On appeals, final orders reversed and cause remanded with directions; on cross-appeal, non-final orders affirmed.*

Before Kloppenburg, P.J., Blanchard, and Graham, JJ.

¶1      BLANCHARD, J. The Columbia County zoning administrator granted an administrative permit for the construction of a new telecommunications tower. Opponents of the proposed tower site appealed to the Columbia County Board of Adjustment ("the BOA"), arguing in part that the permit violates a

county ordinance providing that new towers cannot be closer than one-half mile to existing telecommunications towers. The BOA affirmed the permit. This was based in part on the determination that the county's tower-separation ordinance does not stand in the way of the permit because the ordinance is preempted by a state statute that limits how political subdivisions may regulate the siting and construction of telecommunication towers. *See* WIS. STAT. § 66.0404 (2021-22).[1]

¶2 On certiorari review, the circuit court reversed the BOA's permit decision. The court ruled that the BOA lacked authority to treat the county's tower-separation ordinance as unenforceable based on preemption. Instead, the court ruled, because the ordinance was duly enacted by the Columbia County Board of Supervisors, the BOA was obligated to enforce it. *See **Ledger v. City of Waupaca Bd. of Appeals***, 146 Wis. 2d 256, 430 N.W.2d 370 (1988) (reaffirming general rule that zoning boards of appeals may not declare duly enacted ordinances unenforceable).

¶3 We reverse the circuit court's ruling, based primarily on two conclusions. First, the rule reaffirmed in ***Ledger*** did not bar the BOA from applying the preemption doctrine to the tower-separation ordinance. This is because a separate Columbia County ordinance, which the BOA was also required to consider, establishes that all of the county's ordinances are unenforceable to the extent that they conflict with state statutes. Second, the BOA correctly determined that the county tower-separation ordinance is preempted by the state siting-regulations statute. Preemption applies because the tower-separation ordinance

---

[1] All references to the Wisconsin Statutes are to the 2021-22 version unless otherwise noted.

3

logically conflicts with one requirement in the statute, which is that political subdivisions may not enact ordinances "prohibiting the placement of" towers "in particular locations within the political subdivision." *See* WIS. STAT. § 66.0404(4)(c).

¶4 There is a cross-appeal filed solely by Buddy Savich, pro se, who resides on property near the proposed tower site. In the cross-appeal, we interpret Savich to primarily argue that, in the event that we reverse the circuit court ruling overturning the BOA's permit decision (as we do in this opinion), we should remand for further proceedings. This is because, Savich contends, the circuit court improperly declined to address motions that he made in the circuit court to allow discovery and expand the certiorari record. We affirm the circuit court orders that Savich challenges in the cross-appeal because he fails to support his argument that additional discovery should be permitted and that the record should be expanded so that he can pursue additional grounds to reverse the BOA's permit decision on remand.

¶5 We also reject arguments by SBA and Savich to the effect that, separate from the preemption issue, there was not substantial evidence to support the BOA's decision to affirm the permit.

¶6 Based on these conclusions, the permit challenges fail. We reverse the circuit court decision to reverse the BOA's decision affirming the permit issued by the zoning administrator, and we remand with directions to affirm the BOA's decision.

**BACKGROUND**

¶7     Tillman Infrastructure, LLC, joined by mobile service provider AT&T Mobility, applied to the Columbia County Planning and Zoning Department ("the Department") for a permit to construct a new tower at an identified site.[2]  The Tillman tower would house telecommunications equipment owned and operated by AT&T.  Standing 260 feet tall, it would be located on land zoned for agricultural uses in an unincorporated part of the county, specifically on land leased from Chris McNicol and Robin McNicol.  *See* WIS. STAT. § 66.0404(5) (permitting counties to regulate towers and telecommunications equipment "only in the unincorporated parts of the county").

¶8     An existing 199-foot tower owned by SBA Structures, LLC, is closer than one-half mile to the proposed Tillman tower site.  AT&T has leased space on the SBA tower for AT&T telecommunications equipment since 2001.  The Tillman-AT&T permit application took the position that AT&T should be allowed to relocate its telecommunications equipment from the SBA tower to the proposed Tillman Tower because that would save AT&T tower-leasing costs.

¶9     The Columbia County zoning director issued an administrative permit to Tillman allowing construction of the tower at the proposed site.

---

[2] For ease of reference, in place of the statutory phrase "mobile service facility," we generally use the phrase "telecommunications equipment," and in place of "mobile service support structure" we generally use the term "tower."  *See* WIS. STAT. § 66.0404(1)(L) ("'Mobile service facility' means the set of equipment and network components, including antennas, transmitters, receivers, base stations, power supplies, cabling, and associated equipment, that is necessary to provide mobile service to a discrete geographic area, but does not include the underlying support structure."); § 66.0404(1)(n) ("'Mobile service support structure' means a freestanding structure that is designed to support a mobile service facility.").

¶10 SBA challenged that decision in an appeal to the BOA. Also filing an appeal to the BOA were Buddy Savich and Janel Savich, who would be neighbors to the new tower.[3]

¶11 SBA and Savich both contended that the permit violated two Columbia County ordinances: one that requires the separation of towers from each other by at least 2,640 feet (one-half mile), COLUMBIA COUNTY ORD. 16-125-220(H)(6) (April 2019) ("the tower-separation ordinance"); and another that requires applicants to submit sworn statements demonstrating justification for the construction of new towers with telecommunications equipment, ORD. 16-125-220(D)(1)6. (April 2019); *see also* WIS. STAT. § 66.0404(2)(b)6. (also requiring sworn statements of need).[4] Savich alone argued that the permit violated a third ordinance that establishes a balancing test for the issuance of permits in this context. *See* ORD. 16-125-220(A)(1).

¶12 The BOA received extensive submissions from the parties and held a public hearing. At the hearing, the BOA received additional evidence, heard arguments, and deliberated. The evidence included testimony by a Department employee that the proposed Tillman tower would be about 2,530 feet from the existing SBA tower—110 feet short of one-half mile—and that it was not feasible to site the Tillman tower 110 feet further away, because this would put it "in the middle of the wetland directly [to the] south."

---

[3] For ease of reference, we use "Savich" to refer both to Buddy and Janel in the county-level proceedings and also to Buddy at all stages of the proceedings.

[4] Columbia County amended and renumbered its ordinances in 2021. For all references to the ordinances, we follow the parties in citing to the ordinances adopted in May 2014, and amended in April 2019, which were in effect in August 2020 when the Tillman-AT&T application for a zoning use permit was filed.

¶13 The BOA affirmed the permit in a written set of findings of fact and conclusions of law. This was an exercise of the BOA's authority under WIS. STAT. § 59.694(8), which applies when a county board of adjustment considers an appeal of a decision of a county officer, such as the zoning administrator. Under § 59.694(8), the BOA "shall have all the powers of the officer" to reverse, affirm, or in any manner change or replace the officer's decision.

¶14 On the preemption issue, the BOA agreed with Tillman that the county tower-separation ordinance is preempted by WIS. STAT. § 66.0404. On that basis the BOA declined to enforce the tower-separation ordinance. Regarding the adequacy of the statement of need, the BOA decided that an affidavit of AT&T's director of network planning, together with oral testimony given to the BOA by an AT&T real estate manager, were "sufficient to meet the requirements set forth in [COLUMBIA COUNTY ORD.] 16-125-220(D)(1)6. and § 66.0404(2)(b)6." Resolving Savich's balancing-test argument, the BOA determined that the zoning administrator "properly weighed the factors set forth in [ORD.] 16-125-220(A)(1)," and on that basis the BOA accepted "as its own" the administrator's "determination relating to such factors."

¶15 In the Columbia County Circuit Court, SBA filed a joint complaint for declaratory relief based on WIS. STAT. §§ 806.04 and 66.0404(2)(f) and for certiorari review based on WIS. STAT. § 59.694(10). The complaint named the BOA, the Department, and Tillman as defendants, and the McNicols as "interested persons." The next day Savich filed a complaint and petition in the circuit court naming all those parties as defendants. The cases were consolidated. The circuit court dismissed SBA's claim for declaratory relief, and this court ruled that the only relief that Savich could seek would be on certiorari review, as opposed to declaratory relief. *Savich v. Columbia Cnty. Bd. of Adjustment*,

7

No. 2022AP1348, unpublished slip op. (WI App May 11, 2023). The result, not disputed on appeal, is that the circuit court ruling at issue here is exclusively the product of certiorari review.

¶16 On June 22, 2022, the circuit court granted Tillman's motion to dismiss Savich's complaint on the ground that it was filed untimely. Savich appealed that ruling. *Id.* In May 2023, this court reversed the dismissal of Savich's complaint. *Id.*

¶17 While Savich's appeal of the dismissal of his complaint was pending, the circuit court proceeded to address the merits of SBA's challenge to the permit. On November 30, 2022, the court issued an order reversing the BOA's decision affirming the permit. Citing *Ledger*, the court ruled that the BOA "acted outside of its jurisdiction[,] contrary to law," because the BOA improperly "substituted its judgment and interpretation of the law" for that of the county board of supervisors in enacting the tower-separation ordinance.

¶18 The proponents of the Tillman tower appealed the circuit court order, and this court stayed the appeal pending the outcome of Savich's appeal. Following our reversal of the circuit court's dismissal of Savich's complaint, on July 24, 2023, the circuit court entered an order stating that "the rights and remedies adjudicated" in its earlier November 30, 2022 order "apply in full to all remaining parties in this case: Buddy J. Savich, SBA Structures LLC, and all Defendants." The Tillman tower proponents filed a second appeal.

¶19 This court consolidated the two appeals for briefing and disposition by an order dated August 2, 2023. *See* WIS. STAT. RULE 809.10(3). Before us now are the following: (1) arguments in the consolidated appeals by Tillman, AT&T, and the McNicols (collectively, "Tillman"), the parties with a shared

8

interest in construction of the proposed tower, challenging the circuit court's ruling reversing the BOA's permit decision; (2) arguments in the consolidated appeals by the Department and the BOA (collectively, "the county parties"), in part paralleling the arguments made by Tillman; and (3) a cross-appeal by Savich, which we construe to be defensive, in the sense that we need to address the cross-appeal only if, in the appeal, we reverse the circuit court ruling reversing the BOA's permit decision. That is, only if we reverse the circuit court ruling in the appeal does Savich seek in the cross-appeal a remand for further proceedings in which the circuit court would address, for a second time, whether substantial evidence supported the BOA's permit decision. Tower opponents SBA and Savich have filed separate briefs in support of the circuit court's reversal of the BOA's permit decision.

## DISCUSSION

¶20     There is no dispute about the following. If the BOA was required to enforce the tower-separation ordinance, then the permit is invalid because the Tillman tower would be closer than one-half mile to the existing SBA tower. We first address the issues raised in the appeals regarding whether the BOA was required to enforce the tower-separation ordinance: whether the BOA kept within its jurisdiction, under the rule reaffirmed in *Ledger* that recognizes one limitation on the authority of zoning boards of appeals; and, assuming that the BOA kept within its jurisdiction, whether the siting-regulations statute preempts the tower-separation ordinance. Then, having explained our determinations that the BOA kept within its jurisdiction and that the statute preempts the ordinance, we turn to Savich's cross-appeal. After explaining why we reject the cross-appeal, we

9

address whether there was substantial evidence for the BOA's permit decision based on the record as it stands.[5]

¶21　We engage in the interpretation of statutes and county ordinances. This "'begins with the language of the statute. If the meaning of the statute is plain, we ordinarily stop the inquiry.'" *State ex rel. Kalal v. Circuit Ct. for Dane Cnty.*, 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110 (quoted source omitted); *see also* *Milwaukee District Council 48 v. Milwaukee County*, 2019 WI 24, ¶11, 385 Wis. 2d 748, 924 N.W.2d 153 ("In interpreting municipal ordinances, we apply the same principles used in statutory interpretation."). "[S]tatutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd or unreasonable results." *Kalal*, 271 Wis. 2d 633, ¶46. "'If this process of analysis yields a plain, clear statutory meaning, then there is no ambiguity, and the statute is applied according to this ascertainment of its meaning.'" *Id.* (quoted source omitted). If, instead, statutory language is ambiguous, then courts may examine legislative history to resolve the ambiguity. *See id.*, ¶¶50-51.

---

[5] We now briefly explain why we do not address Tillman's argument that SBA lacked standing to seek certiorari review of the BOA's decision in the circuit court. SBA responds in pertinent part that whether it has standing is "moot" and that we should not address this issue. SBA points out that: Savich is a current party on appeal; Savich is aligned with SBA on the issues; SBA and Savich raised the same issues before the BOA and in the circuit court; and SBA and Savich obtained the same relief from the circuit court, which was the only relief they sought. Tillman's reply to these arguments is conclusory. Tillman fails to develop supported arguments that SBA and Savich have taken substantially different material positions, that Savich's positions on appeal are not adequately developed, or that SBA's standing, which would not resolve the substantive issues on appeal, nevertheless merits resolution. Accordingly we decline to address the issue of standing.

¶22    As noted, all of the issues that we address involve certiorari review of the BOA's permit decision. "A person aggrieved by any decision of" a county board of adjustment may timely "commence an action seeking the remedy available by certiorari." WIS. STAT. § 59.694(10).

> When conducting certiorari review, a court reviews the record compiled by the local governmental body, and generally does not take any additional evidence on the merits of the decision. Additionally, the court affords a presumption of correctness and validity to the local governmental body's decision. On appeal of a circuit court certiorari decision, we review the decision of the local governmental body, not the decision of the circuit court.

*Miller v. Zoning Bd. of Appeals of Lyndon Station*, 2022 WI App 51, ¶18, 404 Wis. 2d 539, 980 N.W.2d 295 (cited authority omitted).

¶23    In the contexts here, we review issues of law de novo, independently from the legal determinations rendered by the BOA or the circuit court. *See Ottman v. Town of Primrose*, 2011 WI 18, ¶54, 332 Wis. 2d 3, 796 N.W.2d 411.

¶24    Certiorari review here is limited to whether the BOA: "'(1) kept within its jurisdiction; (2) proceeded on a correct theory of law; (3) did not act in an arbitrary, oppressive, or unreasonable manner that represented its will and not its judgment; and (4) might reasonably take this action based on the evidence.'" *See Oneida Seven Generations Corp. v. City of Green Bay*, 2015 WI 50, ¶41, 362 Wis. 2d 290, 865 N.W.2d 162 (quoted source omitted).

## I.    WHETHER THE BOA KEPT WITHIN ITS JURISDICITON

¶25    Tillman and the county parties argue that the circuit court erred in ruling that the BOA did not keep within its jurisdiction when the BOA decided that the tower-separation ordinance is preempted by the state siting-regulations

11

statute. In the challenged ruling, the court ruled that the BOA should have, but did not, in the words of *Ledger*, "accept" the tower-separation ordinance "as written." *See Ledger*, 146 Wis. 2d at 263 (citing 3 Rathkopf, THE LAW OF ZONING & PLANNING, § 37.02(8) at 37-37 (1988)). According to Tillman and the county parties, the court erred in failing to take into account another ordinance, separate from the tower-separation ordinance. The other ordinance is a rule of use and construction for all county ordinances that forbids enforcement of any ordinance to the extent that it conflicts with a state statute. We agree with Tillman and the county parties.

¶26 Specifically, Tillman and the county parties direct us to COLUMBIA COUNTY ORD. 1-1-7, which we consider to be dispositive on this issue.[6] We call this "the county preemption ordinance."

¶27 The county preemption ordinance is found in the chapter of the county's code of ordinances that establishes rules for the "[u]se and [c]onstruction" of all county ordinances. It states, "To the extent that the provisions of this Code of Ordinances conflict with the Wisconsin Statutes or federal regulations, said statutes and regulations shall control." COLUMBIA COUNTY ORD. 1-1-7(c).[7] The zoning administrator emphasized in testimony to the

---

[6] Tillman and the county parties also highlight another provision in the county's zoning code, which may support their argument but which is less obviously on point. *See* COLUMBIA COUNTY ORD. 16-101-050(B) ("In addition to the requirements of this Columbia County Zoning Code, all land uses and development activities must comply with all other applicable town, county, state, and federal regulations."). We do not discuss this provision further.

[7] For context we note that the county preemption ordinance is one of three conflict-related provisions that are grouped together in one subpart of the rules governing use and construction of Columbia County ordinances. Each of the three provisions addresses a specific category of conflict. The other two provisions state:

(continued)

12

BOA that "the County board supervisors put in place [an ordinance] that say[s] if there's a conflict, statutes rule."

¶28 We conclude that the county preemption ordinance establishes the following as a categorical rule, directed to anyone using or construing a Columbia County ordinance, including the BOA: conflicting state statutes govern in the event of a conflict with the ordinance that is being used or construed.[8]

¶29 Notably, the county preemption ordinance dictates a rule of use and construction that appears to be mandatory: it "shall control." Further, the ordinance is on its face self-executing. It does not reserve for the county board of supervisors, the courts, or any other person or entity the exclusive role of determining whether there is a conflict or, if there is, whether the conflicting

---

(a) If the provisions of different chapters [of the code] conflict with each other, the provisions of each individual chapter shall control all issues arising out of the events and persons intended to be governed by that chapter.

(b) If the provisions of different sections of the same chapter [of the code] conflict with each other, the provision which is more specific in its application to the events or persons raising the conflict shall control over the more general provision.

COLUMBIA COUNTY ORD. 1-1-7 (a), (b).

Separately, we observe that the county preemption ordinance explicitly identifies state statutes (but not state regulations) and federal regulations (but not federal statutes). Yet whatever potential significance these omissions might have in other contexts, it does not matter here because the siting-regulations statute is a state statute.

[8] The circuit court did not rely on the county preemption ordinance. Without elaborating on its reasoning, the court characterized it as a "general catch-all provision." We recognize that it may be a catch-all provision in the sense that it broadly applies to all county ordinances and all conflicting state statutes. But the court did not explain why its broad potential effects renders it inapplicable in this context and we cannot discern a reason.

ordinance is unenforceable. Indeed, in granting the permit, the zoning administrator operated under his authority under the county ordinances to act as "the administrative and enforcement officer for the provisions of [the chapter of the ordinances governing zoning], per the general authorization under Wisconsin Statutes," with a "general duty" "to interpret and administer" the county's relevant ordinances. *See* COLUMBIA COUNTY ORD. 16-150-020(A), (B).

¶30 Turning to the preemptive aspect of the county preemption ordinance, we agree with Tillman and the county parties that the only reasonable interpretation of the phrase "conflict with" is that it contemplates application of the well-established preemption doctrine in Wisconsin. *See Town of Delafield v. Central Transp. Kriewaldt*, 2020 WI 61, ¶5, 392 Wis. 2d 427, 944 N.W.2d 819 ("state law that *conflicts with* federal law is 'without effect'" (emphasis added) (quoted source omitted)); *Associated Builders & Contractors of Wis. Inc. v. City of Madison*, 2023 WI App 59, ¶¶11-13, 409 Wis. 2d 660, 998 N.W.2d 549 (preemption is established when: "(1) the legislature has expressly withdrawn the local government's authority to act; (2) the local ordinance *logically conflicts with* the state legislation; (3) [the ordinance] 'defeats the purpose of the state legislation'; or (4) [the ordinance] 'violates the spirit of state legislation'" (emphasis added) (quoted authority omitted)). This point is not disputed on appeal. Both SBA and Savich implicitly acknowledge that the county preemption ordinance calls for the application of the preemption doctrine established in Wisconsin law.

¶31 We conclude that the BOA acted within its jurisdiction by applying the county ordinances—including the county preemption ordinance—when it addressed whether the state siting-regulations statute preempts the county tower-separation ordinance. We next explain why we conclude that the reasoning in

14

*Ledger* does not undermine the BOA's decision to consider the preemption doctrine, and that *Ledger* actually supports the BOA decision.

¶32    *Ledger* reaffirms the long-standing Wisconsin rule that local zoning boards of appeals lack authority to ignore or invalidate ordinances that have been duly enacted by local lawmakers. *See Ledger*, 146 Wis. 2d at 262-66. In discussing this rule, the *Ledger* court drew from discussion in *State ex rel. Tingley v. Gurda*, 209 Wis. 63, 67-68, 243 N.W. 317 (1932), and *Kmiec v. Town of Spider Lake*, 60 Wis. 2d 640, 645-46, 211 N.W.2d 471 (1973). In *Tingley*, our supreme court determined that a mandamus petition was a proper vehicle to challenge the enforcement of a zoning ordinance, because challenging the rule through an appeal to the zoning board of appeals would have been unavailing, given that the board of appeals was not authorized to address a claim that a zoning rule was unconstitutional. *Tingley*, 209 Wis. at 67-68. The legislature did not "intend[] to clothe" a "mere administrative agency [of a city] with the power to repeal the legislative acts of the city council." *Id.* Similarly, in *Kmiec*, the supreme court determined that an action for declaratory judgment was a proper vehicle to challenge the constitutionality of a town zoning ordinance. *Kmiec*, 60 Wis. 2d at 645-46. The supreme court explained that the plaintiff in *Kmiec* was not required to exhaust administrative remedies because a town zoning review board "is clothed with no right to repeal or declare unconstitutional zoning ordinances enacted by the legislative body from which it derives its existence." *Id.* In *Ledger*, after reviewing these points from *Tingley* and *Kmiec*, we concluded that a city board of appeals lacked the authority to decline to enforce an ordinance "based on [the] determination that [it] was vague and arbitrary, and thus invalid." *Ledger*, 146 Wis. 2d at 258, 266 (applying the reasoning in *Tingley* and *Kmiec* to

the *Ledger* facts, which involved the local board identifying arbitrariness as the ordinance defect, not "specific constitutional issues").

¶33 Under this precedent, zoning boards of appeals are in the nature of local administrative agencies and therefore their authority is limited by the state statutes that create and define their authority. The limitation most pertinent here is that these boards are not generally permitted to treat ordinances enacted by county boards as unenforceable. *See Tingley*, 209 Wis. at 67-68 ("[G]enerally," the "powers of review" possessed by boards of review "are limited to practical difficulties, or unnecessary hardship, in the way of carrying out the strict letter of the law."). As summarized above, *Ledger*, *Tingley*, and *Kmiec*, unlike this case, did not involve a claim that a zoning board should treat an ordinance as invalid based on statutory preemption, as opposed to a challenge based on such grounds as unconstitutionality or arbitrariness. But we assume without deciding that the reasoning of these cases applies equally when—in the absence of an ordinance that has the effect of the county preemption ordinance here—a zoning board deems a zoning ordinance unenforceable due to preemption by state or federal statutes.[9]

---

[9] Related to this assumption we make, we need not and do not reach the parties' arguments on a broader issue, which current Wisconsin case law does not address. The broader issue would be whether *Ledger* generally prohibits zoning boards from declining to enforce an ordinance when the issue is the ordinance's potential preemption by state or federal statutes and the political subdivision has *not* enacted an ordinance that has the effect of the county preemption ordinance here. For example, SBA asserts that it would open a "Pandora's box of legal interpretation and disputes" "if local zoning administrators and zoning boards were permitted to simply apply their own interpretation of State law" to local ordinances. As explained in the text, we conclude that here it is sufficient that the Columbia County board of supervisors has enacted the preemption ordinance, and we need not address the hypothetical scenario in which it had not. Absent unusual circumstances, we aim to resolve appeals on "the narrowest possible grounds." *See State v. Castillo*, 213 Wis. 2d 488, 492, 570 N.W.2d 44 (1997).

¶34     Here, the BOA did not act as if it were "clothed with" authority to repeal or disregard a county ordinance. Instead, the BOA was directed by the county preemption ordinance that it could not enforce the tower-separation ordinance to the extent that it conflicts with the state siting-regulations statute. That is, the BOA was not permitted to "'nullify'" the county preemption ordinance. *See Ledger*, 146 Wis. 2d at 265 (favorably quoting ***Bearce v. Zoning Bd. of Appeals of Brockton***, 219 N.E.2d 15, 17 (Mass. 1966), for the proposition that a local zoning board of appeals lacks authority to "nullify acts of the local legislative body which is charged … with the adoption and amendment of zoning ordinances"). While none of the precedent cited by the parties addresses the specific factual and procedural posture here, we conclude that the BOA acted within its jurisdiction, which was consistent with the reasoning in *Ledger*.

¶35     Savich contends that *Ledger* "provides no qualification, no contingency, no exception" that would permit the BOA not to "follow an ordinance as written." But we have just explained why the county preemption ordinance required the BOA to treat the tower-separation ordinance as unenforceable to the extent that it conflicts with a state statute.

¶36     SBA and Savich both suggest that, short of a declaration by a court that an ordinance is preempted, only the county board of supervisors could limit the reach of the tower-separation ordinance, by revising or withdrawing it. Stated in terms of certiorari review analysis, the argument would be that, regardless of the county preemption ordinance, the BOA did not keep within its jurisdiction because the BOA could not entertain Tillman's preemption argument in the absence of a prior court declaration of preemption. In a related vein, Savich argues at length that a declaratory judgment action would have been a better

17

vehicle than this certiorari review action to determine whether the tower-separation ordinance is unenforceable based on preemption.

¶37 SBA and Savich attempt to support these arguments by making two sets of related assertions. One is that the county and the county board of supervisors would necessarily have been parties to an action for declaratory relief. *See* WIS. STAT. § 806.04(11) (stating in pertinent part that, in an action for declaratory relief, "all persons shall be made parties who have or claim any interest which would be affected by the declaration" sought). Savich also takes the position that discovery would have been conducted in a declaratory judgment action. But assuming without deciding that in a declaratory judgment action the county and its board of supervisors would have been parties and also that discovery would have been permitted, this addresses only aspects of what would have happened in such an action. SBA and Savich do not provide a satisfactory answer to the following question: Why, on the facts here, were the Tillman tower proponents required to obtain a declaration of preemption by a court before the BOA could apply the county preemption ordinance to deem the tower-separation ordinance unenforceable? They merely suggest an alternative route to litigate this permit dispute, but they do not show that this was the required route.

¶38 The other related assertion made by SBA and Savich is that participation by the county and the county board of supervisors in an action for declaratory relief would help inform proper decisions on the preemption issue by the circuit court and any appellate court. Again, this simply evokes an alternative litigation route, without explaining why it was obligatory here. In addition, SBA and Savich do not suggest what type of evidence or argument that the county or the county board uniquely had to offer that could have made a difference to a court in reaching the correct result on preemption, which presents a legal issue. Savich

18

argues that the one-half mile distance established in the tower-separation ordinance might have a sound basis in science or public policy, but such arguments are beside the point in preemption analysis. The merits of the ordinance are not at issue, only whether it is preempted by state statute.

¶39    In making these arguments, SBA and Savich rely heavily on *Hearst-Argyle Stations, Inc. v. Board of Zoning Appeals of Milwaukee*, 2003 WI App 48, 260 Wis. 2d 494, 659 N.W.2d 424. As we now explain, we conclude that the discussion in *Hearst-Argyle Stations* that they cite does not apply here, because that opinion does not address a situation in which the local legislature has enacted a provision like the county preemption ordinance.

¶40    In a brief reference, this court in *Hearst-Argyle Stations* determined that a party challenging a city board of zoning appeals decision in a certiorari review action could not argue in that action that city zoning ordinances were preempted by a federal agency directive, but instead the party had to present the preemption argument to a court in an action for declaratory relief. *See id.*, ¶32 (citing *Kaiser v. City of Mauston*, 99 Wis. 2d 345, 355, 299 N.W.2d 259 (Ct. App. 1980), *overruled on other grounds*, *DNR v. City of Waukesha*, 184 Wis. 2d 178, 191, 515 N.W.2d 888 (1994)).[10]    Unlike in the *Ledger*-*Tingley*-*Kmiec* line of

_____

[10] While it does not matter to our analysis for reasons stated in the text, we observe that there may be reasons to question this statement in *Hearst-Argyle Stations, Inc. v. Board of Zoning Appeals of Milwaukee*, 2003 WI App 48, 260 Wis. 2d 494, 659 N.W.2d 424. *See Kaiser v. City of Mauston*, 99 Wis. 2d 345, 354-55 & n.15, 299 N.W.2d 259 (Ct. App. 1980) (rejecting argument that certiorari was "the exclusive method of reviewing the ordinances or resolutions of a local legislative body" and stating that a "declaratory judgment has long been held to be *a* proper method of challenging the validity of an ordinance" (emphasis added)), *overruled on other grounds by DNR v. City of Waukesha*, 184 Wis. 2d 178, 191, 515 N.W.2d 888 (1994); *State ex rel. Ziervogel v. Washington Cnty. Bd. of Adjustment*, 2004 WI 23, ¶¶12-14, 36-40, 269 Wis. 2d 549, 676 N.W.2d 401 (analyzing, on certiorari review, whether county ordinance standard for zoning variances "logically conflict[ed]" with statutory grant of discretion to local boards of adjustment).

opinions, in *Hearst-Argyle Stations* the issue was invalidation of an ordinance based on preemption. But notably for current purposes, this court in *Hearst-Argyle Stations* did not indicate whether the city in *Hearst-Argyle Stations* had an ordinance equivalent to the county preemption ordinance here. We assume without deciding that *Hearst-Argyle Stations* should be interpreted to stand for a general rule—seemingly in line with *Ledger*'s recognition of the limited authority of local boards of zoning appeals—that, in the absence of a provision resembling the county preemption ordinance, such boards are limited to addressing claims that local ordinances are preempted by state or federal laws only after there has been a ruling by a court in a declaratory action. With that assumption, it remains that no statement in *Hearst-Argyle Stations* contradicts the proposition that in the circumstances here, given the county preemption ordinance, there was no need for the tower permit applicants, the zoning administrator in Columbia County, or the BOA to await the results of a declaratory judgment action before addressing the preemption issue.

¶41    In sum on this issue, we conclude that SBA and Savich fail to show that the BOA did not keep within its jurisdiction when it addressed the preemption issue under the *Ledger* rule and in the absence of a court's declaration that preemption applies.[11]

---

[11] Given this conclusion, we need not and do not reach the alternative arguments by Tillman and the county parties that it would have been impractical, or perhaps even impossible, for the Department or the BOA to seek declaratory relief before or after the BOA was called on to address the validity of the permit in the appeals brought by SBA and Savich.

## II.   WHETHER THE BOA CORRECTLY APPLIED PREEMPTION

¶42   The parties dispute whether the BOA proceeded on a correct theory of law when it determined that the state siting-regulations statute preempts the county tower-separation ordinance.  Preemption presents an issue of law that we review de novo.  ***Central Transp. Kriewaldt***, 392 Wis. 2d 427, ¶4.  We first summarize basic features of the statute and the county ordinances and then explain why we conclude that one provision in the state statute preempts the county tower-separation ordinance.

### A.  State siting-regulations statute pertinent to preemption

¶43   In 2013 the state legislature "created WIS. STAT. § 66.0404, which requires [political subdivisions] to use statewide standards for the siting and construction of" towers.  ***Eco-Site, LLC v. Town of Cedarburg***, 2019 WI App 42, ¶11, 388 Wis. 2d 375, 933 N.W.2d 179; 2013 Wis. Act 20, § 1269I.  The state siting-regulations statute preempts some, but not all, local control in this area, by providing that, "subject to the statute," counties, towns, and villages "may enact zoning ordinances 'to regulate any ... siting and construction'" of new towers and telecommunications equipment.  ***Eco-Site***, 388 Wis. 2d 375, ¶11 (quoting § 66.0404(2)(a)1.).  If a political subdivision enacts such an ordinance after July 2, 2013, as Columbia County did here, the ordinance is "[s]ubject to the provisions and limitations" of the state siting-regulations statute, § 66.0404(2)(a), and the county may regulate the "siting and construction of a new" tower and telecommunications equipment "only as provided in" the statute, § 66.0404(2)(h).

¶44   The state siting-regulations statute distinguishes between those applications for permits to collocate telecommunications equipment on an existing

21

tower and those applications for permits to site and construct new towers. *See, e.g.*, WIS. STAT. § 66.0404(1)(d)-(f), (L), (r); (2)(a). Most pertinent here are provisions in the statute addressing applications seeking permission to site and construct new towers.

¶45 The statute also dictates procedures that must be followed in connection with permit applications. If a political subdivision chooses to regulate tower siting and construction plans, "the regulation shall prescribe the application process which a person must complete" in that political subdivision, following the process set forth in the statute. WIS. STAT. § 66.0404(2)(b).

¶46 One key feature of the mandated process is the definition of a "complete application" and the direction that political subdivisions "shall consider the application complete" if it "contains all of [that] information." *See* WIS. STAT. § 66.0404(2)(b)-(c). Information that must be included in an application to construct a new tower includes "a construction plan" and justifications for the project, to which we now turn. *See id.*

¶47 The justification aspect of a "complete application" involves the use of a "[s]earch ring," which the statute defines as follows:

> [A] shape drawn on a map to indicate the general area
> within which a [tower] should be located to meet radio
> frequency engineering requirements, taking into account
> other factors including topography and the demographics of
> the service area.

WIS. STAT. § 66.0404(1)(r). In other words, as part of the mandated process to complete an application, the applicant must draw on a map a wireless service coverage area that calls for a new tower which would be located inside the ring,

given relevant considerations of technology, features of the physical environment, and cellular service uses and needs.

¶48    The search ring is central to the required statement of justification for the project:

> If an application is to construct a new [tower], [the application "shall contain"] an explanation as to why the applicant chose the proposed location and why the applicant did not choose collocation, including a sworn statement from an individual who has responsibility over the placement of the [tower] attesting that collocation within the applicant's search ring would not result in the same mobile service functionality, coverage, and capacity; is technically infeasible; or is economically burdensome to the mobile service provider.

WIS. STAT. § 66.0404(2)(b)6.; *see also* § 66.0404(2)(e) ("A political subdivision may disapprove an application if an applicant refuses to evaluate the feasibility of collocation within the applicant's search ring and provide the sworn statement described under para. (b)6."). Thus, the applicant must explain generally why the applicant proposes a particular site for a new tower and then supplement that general explanation with a sworn statement specifically addressing why "collocation within the applicant's search ring": (1) "would not result in the same mobile service functionality, coverage, and capacity"; (2) "is technically infeasible;" or (3) "is economically burdensome to the mobile service provider." This set of requirements manifests a choice for collocation in lieu of tower construction, toward the policy goal of limiting unnecessary construction of new towers.

¶49    We pause to note that, while the application process dictated by the statute cannot be properly understood without a familiarity with the search ring concept, there is no direct connection between a search ring and what we explain

23

below are the circles of prohibition created by the Columbia County tower-separation ordinance. The search ring is an area, of whatever shape, that must be defined in each application for a new tower. In contrast, a circle of prohibition is what we call the one-half mile radius that extends in all directions from every existing tower by operation of the tower-separation ordinance.

¶50 Bearing in mind that clarification and the general nature of a "complete application," we turn to the directions in the state siting-regulations statute about how political subdivisions must address applications. A political subdivision must accomplish all of the following within 90 days of its receipt of a "complete application," or else the application is deemed approved by operation of law: (1) "[r]eview the application to determine whether it complies with all applicable aspects of the political subdivision's building code and, subject to the limitations in [the siting-regulations statute], zoning ordinances";[12] (2) make a final decision whether to approve or disapprove the application; (3) issue a written decision to the applicant; and (4) if the decision is to disapprove, include in the written decision "substantial evidence" in support of that decision. WIS. STAT. § 66.0404(2)(d).

¶51 In addition to defining what a "complete application" consists of and how it is reviewed by political subdivisions generally, the state siting-regulations statute prohibits political subdivisions from taking specific actions in regulating towers and telecommunications equipment. *See* WIS. STAT. § 66.0404(4). The

---

[12] No party draws our attention to any provision in the Columbia County building code that is pertinent here.

parties discuss three of the specific limitations in subpart (4), namely, those providing that political subdivisions "may not do any of the following":

> (c) Enact an ordinance prohibiting the placement of a [tower] in particular locations within the political subdivision.
>
> ….
>
> (p) Disapprove an application based on an assessment by the political subdivision of the suitability of other locations for conducting the activity.
>
> ….
>
> (r) Impose a setback or fall zone requirement for a [tower] that is different from a requirement that is imposed on other types of commercial structures.

Sec. 66.0404(4). As discussed in more detail below, we consider only one of these limitations to be dispositive, the first in order. That is, we conclude that subpart (4)(c) preempts the tower-separation ordinance.

## B. Columbia County Ordinances Pertinent to Preemption

¶52    Chapter 16 of the Columbia County ordinances is the county's zoning code. The county board incorporated into the zoning code COLUMBIA COUNTY ORD. 16-125-220, "Mobile and Radio Broadcast Services," with the general purpose to "regulate by zoning permit … the siting and construction of any new" tower and telecommunications equipment. ORD. 16-125-220(A) (statement of purpose and intent).[13] Adopting this ordinance is consistent with one

---

[13] The ordinance also states that it is intended to accomplish objectives that include "[m]inimiz[ing] adverse effects of" towers and telecommunications equipment; and "[m]aintain[ing] and ensur[ing]" "a non-discriminatory, competitive[,] and broad range of mobile services and high quality mobile service infrastructure consistent with the Federal Telecommunications Act of 1996" that is supportive of first responder networks. COLUMBIA COUNTY ORD. 16-125-220(A) (statement of purpose and intent).

(continued)

requirement in the state siting-regulations statute that we have already referenced: political subdivisions electing to regulate new tower siting and construction must expressly create a process following the state-mandated procedures and standards. *See* WIS. STAT. § 66.0404(2)(b).

¶53    COLUMBIA COUNTY ORD. 16-125-220 tracks in many respects the state siting-regulations statute, including incorporating aspects of the statute. *See, e.g.*, ORD. 16-125-220(B)(1) (incorporating "[a]ll definitions contained in WIS. STAT. § 66.0404(1)"). Notably, the county ordinance includes a verbatim repetition of the sworn-justification provision in the statute. *Compare* ORD. 16-125-220(D)(2)6. *with* § 66.0404(2)(b)6.

¶54    In contrast, however, the state siting-regulations statute contains no analog to the county tower-separation ordinance. The tower-separation ordinance states that, with two exceptions not pertinent to this case, towers "shall be separated [from one another] by a minimum of 2640 feet." COLUMBIA COUNTY ORD. 16-125-220(H)(6).

### C. Preemption standards

¶55    It is a "bedrock principle" in Wisconsin "that political subdivisions retain their ability to govern in the absence of state legislation." *Adams v. State Livestock Facilities Siting Review Bd.*, 2012 WI 85, ¶29, 342 Wis. 2d 444, 820 N.W.2d 404. "However, the legislature may, on issues of statewide concern, prohibit political subdivisions from enacting ordinances, or invalidate ordinances

---

No party argues that the Federal Telecommunications Act is pertinent to any issue in these appeals and cross-appeal.

already promulgated." *Id.* When political subdivisions adopt ordinances that address local issues involving matters of statewide concern "'concomitantly'" with the state, local authority "'is limited to ordinances that complement rather than conflict with the state legislation.'" *Id.*, ¶32 (quoted sources omitted). SBA and Savich do not dispute that the preemption issue here presents a topic of statewide concern.

¶56 Thus, despite the broad grants of power to political subdivisions, state legislative enactments may limit the operation of local ordinances when there are overlapping state and local concerns, so long as any of the following applies: (1) the legislature expressly withdraws the political subdivision's authority to act; (2) the local ordinance logically conflicts with the state legislation; (3) the ordinance "defeats the purpose of the state legislation"; or (4) the ordinance "violates the spirit of state legislation." *Associated Builders & Contractors*, 409 Wis. 2d 660, ¶¶11-13. Our supreme court has referred to these as four "tests," each of which can independently establish that the state has "withdraw[n] the power of the municipality to act." *Anchor Sav. & Loan Ass'n v. Equal Opportunities Comm'n*, 120 Wis. 2d 391, 397, 355 N.W.2d 234 (1984).

### D. Prohibition on enacting ordinances prohibiting tower placements "in particular locations within the political subdivision"

¶57 We agree with Tillman and the county parties that the tower-separation ordinance, at a minimum, logically conflicts with WIS. STAT. § 66.0404(4)(c), which bars political subdivisions from enacting an ordinance that prohibits the placement of a tower in "particular locations within the political subdivision." This application of the unambiguous terms of subpart (4)(c) is sufficient to resolve the preemption issue and we do not take up alternative arguments for preemption discussed by the parties. *See State v. Castillo*, 213

Wis. 2d 488, 492, 570 N.W.2d 44 (1997) (appellate courts generally aim to resolve appeals on "narrowest possible grounds"). This includes arguments by the Tillman tower proponents that multiple provisions in the state siting-regulations statute, when considered together, have a combined preemptive effect.

¶58 As a threshold issue, SBA argues that the Tillman tower proponents cannot rely on WIS. STAT. § 66.0404(4)(c) as a basis for preemption, because the BOA did not explicitly address subpart (4)(c) in its decision. In its written decision, the BOA stated its conclusion in favor of preemption, citing generally to § 66.0404, but it did not explain the reasoning for that conclusion. A county zoning and sanitary specialist testified to the BOA that subpart (4)(c) provided a basis for preemption.

¶59 We reject SBA's threshold argument because SBA and Savich had an opportunity to try to persuade the BOA that WIS. STAT. § 66.0404(4)(c) is not a proper basis for preemption. Further, we now review de novo the legal issue of whether preemption applies in this certiorari review action, and all parties have had a chance to address this issue on appeal. *See Moreschi v. Village of Williams Bay*, 2020 WI 95, ¶14, 395 Wis. 2d 55, 953 N.W.2d 318 (reviewing de novo whether local zoning board violated due process rights of plaintiff in certiorari review action). SBA does not contend that additional facts needed to be developed for a proper resolution of this legal issue. It would be pointless for us to remand this case to the BOA for it to consider a fully briefed legal issue that requires no further factual development.

¶60 Moving to the merits on preemption, the issue is whether the tower-separation ordinance is "an ordinance prohibiting the placement of a [tower] in particular locations within" the county. The parties dispute the meaning of

28

"particular locations." Tillman and the county parties argue that each one-half mile radius that extends in all directions from an existing tower site at the time of each application creates "particular locations" where new towers are prohibited, and that these locations can be readily identified on a map at application time. SBA and Savich, by contrast, primarily argue that "particular locations" means something narrower, that it refers only to locations that are identified by street addresses or other property designations or descriptions that identify spots or areas on the county map that are fixed in a virtually permanent way. We now explain why we agree with Tillman and the county parties.

¶61 The tower-separation ordinance logically conflicts with the unambiguous terms of WIS. STAT. § 66.0404(4)(c), because the tower-separation ordinance prohibits placement of a new tower at any of the "particular locations" within Columbia County that are described by the areas of circles defined by the one-half mile radiuses extending in all directions from each existing tower at the time of the application for a new tower. *See* § 66.0404(4)(c); **Anchor**, 120 Wis. 2d at 397 (local ordinance nullified when it "logically conflicts with the state legislation"). Put slightly differently, the area of each circle within the county that is described by a one-mile-diameter line segment that bisects the site of an existing tower creates a blanket prohibition covering "particular locations within" the county, without regard for zoning designations or any other relevant factor that might weigh in favor of siting a new tower. New towers are prohibited at any spot in the entire area of each of these circles and this prohibition is unqualified as to each circle. Therefore, as a direct consequence of the operation of the ordinance, there is a logical conflict with subpart (4)(c). We see no room for an argument that the tower-separation ordinance could somehow be interpreted narrowly to avoid a logical conflict with subpart (4)(c).

¶62    SBA and Savich argue that the tower-separation ordinance does not prohibit siting towers at "particular locations" in the county for purposes of WIS. STAT. § 66.0404(4)(c) because the phrase "particular locations within the political subdivision" must refer exclusively to locations that are individually identified in the text of an ordinance, such as by street addresses or other property designations or descriptions that identify forever-fixed spots or areas on the county map. Under their interpretation, the tower-separation ordinance is not preempted because it does not call out any such named or identified spot or area, but instead it prohibits the placement of towers merely as an effect of applying the one-half mile distance to the locations of existing towers. In sum, they argue that, because the areas defined by fixed distances surrounding existing towers are not location names explicitly called out in the tower-separation ordinance, the tower-separation ordinance is not preempted by subpart (4)(c).

¶63    SBA and Savich make two observations in support of this argument. First, the locations of existing towers are subject to change every time a new tower is constructed or an existing tower is moved or taken down. Second, Savich in particular notes that the locations of existing towers are chosen by private actors, not by county officials or by operation of the tower-separation ordinance. Savich in particular further suggests that this purpose is to prevent, or at least help detect, bribes of local officials or other improper influences to favor or disfavor the owners or neighbors of identified spots or areas.

¶64    As we explain below in more detail, these arguments fail on several levels. SBA and Savich do not ground their more limited interpretation of WIS. STAT. § 66.0404(4)(c) on the meaning of the specific phrase "particular locations" or more generally on the text of subpart (4)(c) as a whole, in the special context of preemption analysis. In that context, local rules can be preempted by the "logic,"

"purpose," or "spirit" of statutory language.  And, closely related, they fail to support their surprising premise that an ordinance could be subject to preemption only when the ordinance uses terms that closely match the terms of the preempting statute (*i.e.*, the ordinance here speaks in terms of a minimum distance between towers, while the statute speaks of "particular locations").  To the contrary, it is enough that the unambiguous application of the ordinance, based on readily ascertainable facts, has the precise effect that is prohibited by statute.

¶65    As the only direct support for their interpretation of "particular locations within the political subdivision" based on case law, SBA and Savich argue that this court in *Eco-Site* interpreted WIS. STAT. § 66.0404(4)(c) in a manner that precludes its application here.  We disagree.

¶66    The context in *Eco-Site* differs from the context here.  *Eco-Site* involved an application for a conditional use permit to construct a new tower, which called for the town to apply an ordinance under which the town assessed the compatibility of the proposed tower with the land uses and property values of adjacent land.  S*ee Eco-Site*, 388 Wis. 2d 375, ¶¶14-17.  In contrast, the Tillman-AT&T application was for a permitted use under the applicable zoning designation in the Columbia County zoning code.  *See* COLUMBIA COUNTY ORD. 16-125-220(A) ("The purpose of this section is to regulate by zoning permit ….").

¶67    Turning to the specifics of *Eco-Site*, the town's ordinance defined six standards to determine the compatibility of a proposed conditional use with the neighboring area, calling for the application of broadly defined factors involving the public welfare, the impairment of enjoyment or use of neighboring land, and the orderly development of the area.  *See Eco-Site*, 388 Wis. 2d 375, ¶¶14-17.  The town denied the conditional use permit based on what the town deemed to be

31

"the considerable and foreseeable loss in value to the surrounding properties particularly given the rural and rustic nature of the property, and the loss of property sales in the area as a result of the prospect of the tower." *Id.*, ¶6. The town further determined in part that the tower would be detrimental the public health, safety, and general welfare of area residents. *Id.* In other words, the town's ordinance did not identify particular locations where towers are prohibited, but instead it called for a broad inquiry into compatibility of the proposed tower with adjacent land uses. *See id.*, ¶19 (stating that in Wisconsin zoning law, conditional uses are those uses determined by the local legislature to be compatible with other uses in the area, and a proposed conditional use is not necessarily deemed consistent with the public interest, nor is it equivalent to a use as of right).[14]

---

[14] Our supreme court has explained differences between permitted uses and conditional use permits:

> While a permitted use is as of right, a conditional use does not provide that certainty with respect to land use. Conditional uses are for those particular uses that a community recognizes as desirable or necessary but which the community will sanction only in a controlled manner.
>
> A conditional use permit allows a property owner "to put his property to a use which the ordinance expressly permits when certain conditions [or standards] have been met." The degree of specificity of these standards may vary from ordinance to ordinance.

*Town of Rhine v. Bizzell*, 2008 WI 76, ¶¶20-21, 311 Wis. 2d 1, 751 N.W.2d 780 (quoted authority omitted, footnote omitted). As we note in the text, the town ordinance at issue in *Eco-Site, LLC v. Town of Cedarburg*, 2019 WI App 42, 388 Wis. 2d 375, 933 N.W.2d 179, was comprehensive in calling for considerations of compatibility and potential diminution in property values.

¶68    With that background, in *Eco-Site*, this court determined that there was substantial evidence to support the determination that the proposed tower was not compatible with the "uses, values[,] and enjoyment of other Town property in the neighborhood for purposes already permitted." *Eco-Site*, 388 Wis. 2d 375, ¶¶1, 14, 24-27. Most pertinent here, this court also rejected an argument based on WIS. STAT. § 66.0404(4)(c). In challenging the denial of the conditional use permit, the applicants argued in part that the town ordinance that set standards for conditional uses created a particular location where the proposed tower could not be constructed and was therefore preempted by subpart (4)(c). *Eco-Site*, 388 Wis. 2d 375, ¶18. In the single paragraph of *Eco-Site* now highlighted by SBA and Savich, we stated that the tower proponent failed to show preemption under subpart (4)(c) because, we concluded, the town's ordinance setting forth the compatibility conditions did not "identify any specific spot or area within the Town where such structures are prohibited." *Id.* In other words, we concluded that the town's incompatibility determination involving consideration of broad categories of public welfare, impairment of enjoyment or use, and orderly development of the area did not represent the application of a rule that any particular spot or area was off limits to towers. *Id.*, ¶¶16-19 (explaining that the conditional use ordinance at issue "permit[ted] towers, if the conditions are met").

¶69    In contrast here, for reasons we have explained, the tower-separation ordinance identifies specific areas where no permit for the permitted use of a new tower may be granted:  throughout each of the readily identifiable circles of prohibition. For these reasons, we do not interpret *Eco-Site*, as SBA and Savich do, to stand for the proposition that WIS. STAT. § 66.0404 (4)(c) preempts only ordinances that explicitly call out fixed spots on a map. For example, this court in *Eco-Site* referred not only to "spot[s]" but also to "area[s]," and as we have

explained in this case, the circles of prohibition are unambiguously created by the tower-separation ordinance.[15]  *See Eco-Site*, 388 Wis. 2d 375, ¶18.  The logical conflict here is complete.

¶70    As noted, SBA makes a permanency argument.  It observes that, "if an existing tower site is removed," then the tower-separation ordinance "no longer applies" to the locations within the one-half mile radius of the former site (assuming that there are no other existing towers within one-half mile).  Based on this dynamic, SBA may mean to argue that the tower-separation ordinance does not prohibit towers from being constructed at "particular locations" in the county because the prohibitions are not permanent.  Of course it is true that all towers have a time line of use at a given spot:  the date of construction at that spot, perhaps some modification over time, and then, sooner or later, the date of being moved or dismantled and hauled away.  But there are two problems with SBA's argument.  First, WIS. STAT. § 66.0404 (4)(c) does not contain any qualification to the effect that prohibitions of towers at particular locations are allowed if the prohibitions are of sufficiently short duration.  SBA in effect attempts to add such language to subpart (4)(c).  Second, at any given time, existing towers in the political subdivision will be readily identifiable in fixed spots.  SBA and Savich do not suggest a reason for the legislature to have anticipated confusion or reasonable mistakes regarding the locations of existing towers within a political subdivision at

---

[15] Separately, the court in *Eco-Site* rejected an argument by the tower proponents that, because negative perceptions of aesthetics contributed to the town's denial of the conditional use permit for the new tower, application of the town ordinance was preempted by WIS. STAT. § 66.0404(4)(g), which is a specific limitation that an application may not be disapproved "based solely on aesthetic concerns."  *Eco-Site*, 388 Wis. 2d 375, ¶¶20-23.  "[S]olely" in this context means "only," and the town relied on concerns in addition to those about "visual blight."  *Id.*, ¶23.

any given time. Nor do they suggest a reason for the legislature to have anticipated that the existence of towers at particular locations would be so transitory that the tower-separation ordinance is a moving target that could not be subject to preemption under subpart (4)(c).

¶71 Further, SBA and Savich may mean to suggest that the fact that these circles of prohibition occupy relatively large areas—each with an approximate circumference of 3.14 miles and an area of .79 square miles—renders them too vast or amorphous to constitute "particular locations." We reject any such argument. If one assumes that a political subdivision were to enact a tower-separation ordinance shorter than one-half mile, then this would proportionally reduce the number of particular prohibited locations. If the separation distance were longer, the number would proportionally rise.[16] No matter the separation length that may be specified in a tower-separation ordinance, it necessarily creates a full 360 degrees of prohibition and thus describes "particular locations" where new towers may not be constructed.

¶72 To the extent that Savich's particular private-enterprise point is meant as an argument separate from those we have already addressed, it is easily rejected. Savich fails to explain the significance to the preemption issue of the fact that private interests propose the sites for new towers within a political subdivision and then construct them where they are permitted. *See State v. Pettit*, 171 Wis. 2d 627, 646, 492 N.W.2d 633 (Ct. App. 1992) (we need not address the

---

[16] Indeed, at least under the reasoning offered by SBA and Savich, if the county board enacted a tower-separation ordinance of 16 miles—which would create a circle-of-prohibition of 796 square miles, larger than the entire area of Columbia County—this would not logically conflict with WIS. STAT. § 66.0404(4)(c).

merits of inadequately briefed issues). We do not discern a starting point for a preemption-related argument.

¶73 As part of Savich's proposed narrower interpretation of WIS. STAT. § 66.0404(4)(c), one concept that he may aim to convey about the text of the statute is the following. In order for preemption to apply here, the phrase "particular locations" would have to be qualified with additional words such as, "including all locations described by a fixed distance from an existing tower," or "which have the effect of creating areas." On a related point, as we have explained, SBA and Savich also suggest that, for subpart (4)(c) to have preemptive effect on an ordinance, the ordinance would have to identify locations that are identified by a forever-fixed spot or area on the county map.

¶74 The problem with these arguments is that the legislature has chosen to use a sweeping phrase, "particular locations." The only qualification is that the "particular locations" must be found "within the political subdivision." The legislature did not use the phrase "particular location," singular, which in itself might have provided at least a first step in support of the interpretation offered by SBA and Savich, by signaling one spot and one spot only. Instead, the legislature used the plural form, which preempts every ordinance that categorically creates one or more areas of complete prohibition, regardless of the total number of individual spots within those areas at which individual towers are prohibited. *See Eco-Site*, 388 Wis. 2d 375, ¶18 ("area"). Further, if the legislative goal had been to limit the reach of WIS. STAT. § 66.0404(4)(c) to locations that are identified by street addresses or other property designations or descriptions that create forever-fixed spots or areas on the county map, the legislature could easily have used terms to convey that.

¶75     Savich cites an Illinois statute that prohibits political subdivisions from limiting the placement of towers by setting "minimum horizontal separation distances."     *See* 50 ILCS 840/15(d)(4).     This is one interesting alternative formulation to WIS. STAT. § 66.0404(4)(c).     But Savich fails to show how the existence of the Illinois statute demonstrates that a more limited preemptive effect was intended in subpart (4)(c).     Savich correctly notes that the Wisconsin legislature has not explicitly listed a tower-separation distance requirement as one of the prohibited activities listed in § 66.0404(4).     But he fails to support his further assertion that this was an intentional decision to allow local governments to create dispositive tower-separation requirements.

¶76     Savich argues that the prohibited activities listed in WIS. STAT. § 66.0404(4) constitute an exhaustive list, not merely an illustrative one. Whatever its potential merits, this argument is of no value to Savich because we conclude that the unambiguous terms of § 66.0404(4)(c) preempt the tower-separation ordinance.

¶77     SBA submits that some Wisconsin counties other than Columbia have adopted provisions matching or similar to the tower-separation ordinance. But SBA fails to develop a cognizable preemption argument based on that proposition. *See **Pettit***, 171 Wis. 2d at 646.[17]

---

[17] SBA relies on a memorandum by Wisconsin Legislative Council staff, dating from around the time of the enactment of the siting-regulations statute, that contains references to prohibited zoning districts. We do not address this source because we have explained why the meaning of WIS. STAT. § 66.0404(4)(c) is unambiguous for current purposes. *See **State ex rel. Kalal v. Circuit Ct. for Dane Cnty.***, 2004 WI 58, ¶46, 271 Wis. 2d 633, 681 N.W.2d 110. We further note that SBA does not independently develop a statutory interpretation argument based on the concept of prohibited zoning districts; that is, SBA does not provide authority or background to support the concept suggested by the memo.

¶78   In sum on this issue, we conclude that the tower-separation ordinance logically conflicts with the state statute providing that political subdivisions may not "enact an ordinance prohibiting the placement of" a tower "in particular locations within the political subdivision," and, therefore, the BOA properly deemed the tower-separation ordinance to be preempted and accordingly unenforceable. *See* WIS. STAT. § 66.0404(4)(c).

### III.   CROSS-APPEAL

¶79   Savich argues in the cross-appeal that, before the circuit court issued the order reversing the BOA's permit decision that is challenged in the appeals, the circuit court was obligated to give him additional opportunities to challenge the permit, and that the court was not able to make a proper substantial evidence ruling because the court deprived Savich of these opportunities.   More specifically, Savich argues that the court:  "erroneously exercised its discretion when it denied Savich's motion to supplement the record with discovery upon a prima facie showing" of "false swearing" by Michael Bieniek in the affidavit that was submitted with the Tillman-AT&T application; "made a manifest error of law when it denied Savich the right to file a certiorari brief, or to supplem[e]nt or correct the certiorari record"; and "erred when it did not adjudicate the allegations in Savich's complaint."

¶80    We first address and reject a threshold argument made by Tillman (and adopted by the county departments) that we lack jurisdiction over the cross-appeal or that Savich lacks standing to bring it.[18]

¶81    A respondent in an appeal, such as Savich here, may file a cross-appeal to seek "modification of the judgment or order appealed from or of another judgment or order entered in the same action or proceeding."  *See* WIS. STAT. § 809.10(2)(b).    In this cross-appeal, Savich seeks modification of "another judgment or order entered in the same action or proceeding," namely, decisions by the circuit court adverse to Savich in addressing the substantial evidence issue.  In other words, Savich's cross-appeal does not seek to enlarge or otherwise modify the orders that are the subject of the consolidated appeals, nor does he offer an alternative basis to affirm those orders based on the record that existed at the time the court issued them.  Instead, the cross-appeal challenges *prior* nonfinal orders of the circuit court, which Savich contends caused the court to operate from a faulty record that Savich contends he should have been allowed to enhance in the circuit court through discovery and additional argument.  If he were permitted to do this, he argues, this would create a valid basis for the circuit court to reverse the BOA's permit decision and to reject the permit, regardless of our conclusions in the appeal about *Ledger* and preemption.

¶82    Tillman accurately points out that only persons who are aggrieved by judgments or orders may challenge those judgments or orders on appeal.  *See*

---

[18] Before briefing in the consolidated appeals, Tillman moved this court to dismiss Savich's cross-appeal on the same ground.  In a September 18, 2023 order of this court, we denied the motion, reserving the issue for this opinion so that we would have the benefit of full briefing.

*Ford Motor Credit Co. v. Mills*, 142 Wis. 2d 215, 217-18, 418 N.W.2d 14 (Ct. App. 1987) ("A person is aggrieved if the judgment bears directly and injuriously" on the person's interests, meaning that "the person must be adversely affected in some appreciable manner."). Based on this rule, Tillman argues, all of Savich's arguments in this case had to be contained in his respondent's brief in the appeal, because they amount to alternative arguments in favor of the order challenged in the appeal. *See McLellan v. Charly*, 2008 WI App 126, ¶18 n.2, 313 Wis. 2d 623, 758 N.W.2d 94 (there is no need for a cross-appeal by an appeal-respondent who seeks only to defend, and to in no way change, the order or judgment that is challenged in the appeal; arguments that the respondent is entitled to the same relief ordered by the circuit court but based on an alternative ground belong in the respondent's brief in the appeal).

¶83 Tillman's argument fails to recognize that cross-appellants (like appellants generally) are not required to be aggrieved by the final order issued by the circuit court under WIS. STAT. § 809.10(4). *See Auric v. Continental Cas. Co.*, 111 Wis. 2d 507, 516, 331 N.W.2d 325 (1983) ("It is clear that orders challenged on cross-appeal need not be final orders."). For example, a party could fully prevail on the merits in a case but nonetheless properly challenge an adverse decision resulting from earlier rulings of the circuit court, such as those addressing monetary discovery sanctions. Bringing an appeal as a matter of right requires that there be a final order or judgment, WIS. STAT. § 808.03(1), but an appeal from such an order or judgment brings up for potential challenge on appeal all prior nonfinal orders, § 809.10(4).

¶84 With this point in mind, Tillman's argument also fails to recognize that Savich's cross-appeal appears to seek review of alleged circuit court errors that we are required to resolve only in the event of our reversal of the circuit

court's orders that are challenged in the consolidated appeals. It is true that, in the final orders that are challenged in the appeals, Savich did obtain from the circuit court precisely the relief that he sought in the circuit court proceedings—relief in the form of an order to revoke the permit—and as a general rule Savich could not have challenged those orders as they were issued by the circuit court, given that he was in no way aggrieved by them. But Savich's cross-appeal is, in effect, defensive. We are required to address Savich's cross-appeal challenge to the earlier circuit court decisions only if we decide (as we do today) to reverse the circuit court ruling regarding the BOA's permit decision as that ruling was issued by the circuit court.

¶85 Further, the cross-appeal raises issues that are potentially material to the order that the circuit court will enter in light of our opinion today. Put differently, with our decisions today in the appeal, the order regarding the BOA's permit decision that we would require the circuit court to enter (without our considering the merits of the cross-appeal) would be adverse to Savich's interests, and Savich claims that the cross-appeal provides grounds to reverse prior rulings of the circuit court that would change that result. For all these reasons, Savich's challenge to the prior orders of the circuit court is a proper subject for a cross-appeal. Federal authorities have expressed this clearly, consistent with what is permitted and required under the Wisconsin rules. *See* 15A Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, FEDERAL PRACTICE AND PROCEDURE § 3902 at 78 (1992 and 2007 Supp.) ("A party who fully prevailed in the [trial] court may have an equally obvious justification for cross-appeal, to protect interests that otherwise might be adversely affected by disposition of the appeal. Courts readily understand this principle, and have applied it without difficulty, permitting the cross-appeals but deciding them only if disposition of the appeal

41

makes it appropriate."); ***Hartman v. Duffey***, 19 F.3d 1459, 1465 (D.C. Cir. 1994) (Wald, J., concurring) (noting that some cross-appeals are filed to protect contingent interests of a party that has prevailed in the trial court, under the theory that "as soon as the appellate court decides to modify the trial court's judgment, that judgment may become 'adverse' to the cross-appellant's interests and thus qualify as fair game for an appeal").

¶86    Nevertheless, issues raised in a cross-appeal, just like issues raised in an appeal, must be adequately supported. We now explain why we reject Savich's cross-appeal arguments, as best we understand them. We reject any other intended arguments based on a lack of development. *See **Pettit***, 171 Wis. 2d at 646.

*Denial of motion to supplement circuit court record with discovery*

¶87    Savich argues that the circuit court was obligated to allow the parties to conduct discovery in the certiorari review proceedings to pursue his contention that Bieniek's affidavit represented "false swearing." He bases this argument on WIS. STAT. § 59.694(10), which applies to the certiorari review of a decision by a board of adjustment. That provision provides in pertinent part that, "[i]f necessary for the proper disposition of the matter, the [circuit] court may take evidence, or appoint a referee to take evidence and report findings of fact and conclusions of law as it directs, which shall constitute a part of the proceedings upon which the determination of the court shall be made." Sec. 59.694(10). We reject Savich's argument because he fails to persuade us that the circuit court should have considered additional evidence "necessary for the proper disposition of the matter."

¶88    During the BOA proceedings, Savich, then represented by counsel, had a full opportunity to present his positions regarding the proposed Tillman

42

tower. Further, he presented to the BOA, in great detail, the same arguments he now makes about allegedly inaccurate information in the Tillman-AT&T application. It is entirely unclear what *additional* evidence, gathered at the circuit court stage of the proceedings, could have made a difference to the court's application of certiorari review standards. *See **Murr v. St. Croix Cnty. Bd. of Adjustment***, 2011 WI App 29, ¶19, 332 Wis. 2d 172, 796 N.W.2d 837 ("[I]f the circuit court takes evidence that is substantially the same as that taken by the Board, deference to the Board demands that the evidentiary hearing should be treated as a nullity for purposes of determining the standard of review to be applied to the Board's decision."). Savich's argument is based on conjecture and speculation.

*Denying Savich "the right to file a certiorari brief" or to supplement or "correct the certiorari record"*

¶89 As best we can discern, the focus of this argument is a letter and proposed order that Savich filed with the circuit court on July 21, 2023. This occurred after remittitur, following this court's decision to reinstate Savich's complaint in May 2023, and before the circuit court entered its July 24, 2023 order stating that its prior order of November 30, 2022, "and the rights and remedies adjudicated therein, apply in full to all remaining parties in this case: Buddy J. Savich, SBA Structures LLC, and all Defendants." Savich's proposed order of July 21 would have set a schedule for Savich to file a motion to supplement the record, for him to file a "Certiorari Brief," and for the parties to file response and reply briefs.

¶90 We need not resolve whether it carried a risk of prejudice to Savich for the circuit court to proceed on the merits while Savich (ultimately successfully) appealed his dismissal from the proceedings. This is because the vague and

speculative assertions in Savich's July 21, 2023 letter to the court did not support entry of his proposed order. His letter was premised on the merits of a brief that he had previously filed, but the letter did not explain why the previously filed brief justified the proposed order. The letter addresses legal issues that we have resolved against him above. It also incorrectly suggests at points that the court had authority to reverse the BOA based on the court's own assessments of the evidence and the equities, as opposed to applying the limited certiorari review standards.

*Failure to "adjudicate the allegations in Savich's complaint"*

¶91     Savich's briefing does not make clear what could remain that we have not already discussed regarding an alleged failure by the circuit court to "adjudicate the allegations in Savich's complaint." This appears to involve his reiteration of the argument that, without additional discovery in the circuit court proceedings, it was not possible for the circuit court to properly conduct its certiorari review. At a minimum, Savich's arguments are unavailing because they fail to come to grips with the rule that finding facts and weighing evidence were tasks delegated exclusively to the BOA, not to the circuit court, absent errors by the BOA of the types that are properly the subject of certiorari review. *See Oneida Seven Generations*, 362 Wis. 2d 290, ¶43.

### IV.     WHETHER THE BOA'S DECISION IS SUPPORTED BY SUBSTANTIAL EVIDENCE

¶92     As alternative grounds to support affirmance of the circuit court's reversal of the BOA's decision to affirm the permit, SBA and Savich each raise arguments that amount to claims that the BOA lacked substantial evidence to

make its decision. After summarizing the applicable legal standard, we discuss the SBA and Savich arguments separately.

¶93 "'Substantial evidence' is evidence of such convincing power that reasonable persons could reach the same decision as" the BOA, that is, "'credible, relevant and probative evidence upon which reasonable persons could rely to reach'" the challenged decision by the BOA. *See **Oneida Seven Generations Corp.***, 362 Wis. 2d 290, ¶43 (quoted authorities omitted).[19] Substantial evidence "is less than a preponderance of the evidence," but "'more than a mere scintilla of evidence and more than conjecture and speculation.'" ***Id.***, ¶44 (quoted source omitted). "[T]he weight to accord the evidence lies within the discretion of the municipality." ***Id.***

¶94 "In determining whether the substantial evidence test is met, a court conducting a certiorari review should 'tak[e] into account all the evidence in the record,'" including considering all relevant context created by the evidence. *See **id.***, ¶45 (quoted source omitted).

¶95 Although it did so, the BOA was not required to produce a written decision to supplement the record created through its hearing process. *See **Lamar Cent. Outdoor, Inc. v. Board of Zoning Appeals***, 2005 WI 117, ¶31, 284 Wis. 2d 1, 700 N.W.2d 87. Further, its reasoning did not need to be expressed with the level of clarity that judicial opinions aim for. *See **id.***

---

[19] We observe that WIS. STAT. § 66.0404(2)(d)4. provides that when a political subdivision disapproves a permit application, it must "include with the written notification substantial evidence which supports the decision," but this provision is not pertinent here because the Tillman-AT&T permit application was approved.

### A. SBA: Adequacy of Statement of Need

¶96   SBA makes related arguments that are not explicitly framed as challenges based on the lack of substantial evidence, but this appears to be SBA's intent.  The contention is that Tillman's submission of the statement of need justifying the permit, as required by COLUMBIA COUNTY ORD. 16-125-220(D)(1)6. and WIS. STAT. § 66.0404(2)(b)6., was inadequate in several respects, and this left the BOA without substantial evidence to support its decision to affirm the permit. We now provide additional pertinent background.

¶97   One element of the Tillman-AT&T application was a four-page sworn statement of Tim Brenner, "Director-Network Planning" for AT&T. Brenner's statements included the following.  Brenner managed an AT&T program that identifies "economically burdensome antenna site leases" for AT&T's telecommunications equipment and attempts to move such equipment to "lower-cost alternative antenna site lease locations to either improve or maintain wireless coverage."  Brenner professed to be "familiar" both with plans for the proposed Tillman tower and also with the existing SBA tower, which housed some AT&T telecommunications equipment.  The proposed Tillman tower site and the SBA tower are in the search ring drawn by the applicants.  The SBA tower was the only existing tower in the search ring, and having the AT&T equipment remain on the SBA Tower under a collocation agreement "is economically burdensome for AT&T and would not result in the same cost-effective operation as compared to what AT&T could achieve if it relocated its Wireless Facilities to the Tillman Tower."  Brenner's statements were offered in support of his two primary contentions:  that continued collocation on the SBA tower would be economically burdensome to AT&T, and that the proposed Tillman tower would provide "superior mobile service functionality."  This included the assertion that "[t]here

are no other structures (other than the SBA Tower) located in AT&T's search ring capable of accommodating its Wireless Facilities."

¶98 In addition, the Tillman-AT&T application included a sworn statement from Michael Bieniek, working on behalf of Tillman. This included the following averments: a "replacement site is required due to economically burdensome lease terms at the current location that have spiraled well beyond reasonable market rent rates"; and the proposed tower site was selected "to ensure that" it "would provide the County with equal or better coverage than" would be provided by collocation on the SBA tower.

¶99 With that background, SBA argues that Brenner's statement did not provide the BOA with a sufficient basis to establish that Brenner had "responsibility over the placement of" the tower. SBA bases this argument on the language in the state siting-regulations statute, quoted more fully above, relating to applications to construct a new tower instead of choosing to collocate equipment on an existing tower. Specifically, SBA highlights that such applications must "includ[e] a sworn statement from *an individual who has responsibility over the placement of the [tower]* attesting that collocation within the applicant's search ring would not result in the same mobile service functionality, coverage, and capacity; is technically infeasible; or is economically burdensome to the mobile service provider." *See* WIS. STAT. § 66.0404(2)(b)6. (emphasis added).

¶100 The following points offered by Tillman defeat SBA's argument about Brenner's status. First, SBA fails to show why the BOA could not reasonably deem an AT&T employee to be "an individual" with the relevant "responsibility," as those terms are used in WIS. STAT. § 66.0404(2)(b)6., given that Tillman and AT&T filed a joint application. Second, SBA concedes that

Bieniek had that "responsibility," and SBA fails to explain why the BOA could not reasonably consider Bieniek's affidavit to be sufficient for this purpose—particularly since Bieniek adopted Brenner's sworn statement and assertions that relocation of the AT&T telecommunications equipment to the proposed new tower is necessary due to the "economically burdensome" cost of leasing space on the SBA tower.

¶101  Separately, SBA in effect contends that reasonable persons in the position of the BOA could not reach the decision that AT&T's failure to continue collocation on the SBA tower would be "economically burdensome" to it. *See* WIS. STAT. § 66.0404(2)(b)6.  We conclude that the BOA had before it substantial evidence to determine, under the standards summarized above, that "[t]he Sworn Statement of Tim Brenner and the oral testimony of Andrew Flowers were sufficient to meet the requirements set forth in Sec. 16-125-220(D)(1)6., County Ordinances, and WIS. STAT. § 66.0404(2)(b)6."  SBA fails to account for the testimony by Flowers, who identified himself as "senior real estate and construction manager for AT&T Mobility for Illinois and Wisconsin."  Flowers testified in part that AT&T's cost of using the new Tillman tower would be "about two and a half times" cheaper than what it was then paying to lease space on the existing SBA tower, and Flowers further suggested that negotiations with SBA stood no chance of making the costs comparable.  This matched Brenner's sworn statement that, if rent increases by SBA continued at the "current rate," the cost differential between leasing on the SBA tower and on the new Tillman tower would be $3 million over 20 years.  These statements provided a sufficient basis for the BOA determination.

### B. Savich: Failure to address evidence

¶102   Savich makes a series of assertions that, at best, would amount to an argument that the BOA lacked substantial evidence because it ignored the only relevant evidence.  The following summarizes what we discern to be Savich's points, with our explanations for rejecting them.  If we do not address an intended argument, it is because the argument lacks sufficient relevant references to the record and legal authority.

¶103   Savich criticizes alleged actions or omissions by the zoning administrator, but in this certiorari review action we review only actions or omissions of the BOA.

¶104   Savich makes reference to the statement of purpose and intent contained in COLUMBIA COUNTY ORD. 16-125-220, "Mobile and Radio Broadcast Services," quoted *supra* at ¶52 & n.13.  But he fails to show that the purpose and intent statement created substantive standards.  Further, Savich's reliance on this text is partial at best; he fails to refer to all relevant parts of that statement.

¶105   As Tillman points out, Savich directs us to various objections that he made to the permit, but he essentially ignores the contrary evidence presented to the BOA that could reasonably support its decision.  This amounts to a request that we give his evidence more weight than the BOA gave it, which is not the role of a court on certiorari review.  *See **Oneida Seven Generations***, 362 Wis. 2d 290, ¶43.  In particular, the BOA was not obligated to credit and also give substantial weight to Savich's arguments that the new tower would meaningfully reduce the value of his property and limit his use and enjoyment of it.  Further, as the county parties note, his arguments miss the target to the extent that they are based on the section

of the county zoning ordinance governing conditional use permits, not permitted uses. *See supra*, n.14.[20]

## CONCLUSION

¶106   For all of these reasons, in the appeals we reverse and remand to the circuit court with directions to affirm the BOA determination affirming the permit granted by the zoning administrator, and in the cross-appeal we affirm the circuit court's challenged orders.

*By the Court.*—On appeals, final orders reversed and cause remanded with directions; on cross-appeal, non-final orders affirmed.

Recommended for publication in the official reports.

---

[20] In criticizing arguments made by representatives of the Department to the BOA, Savich may also intend to argue that the BOA's decision must be reversed because the BOA relied on a misunderstanding regarding the timing of the enactment of the tower-separation ordinance relative to enactment of all or parts of the siting-regulations statute. If this argument is intended, we reject it for at least the reason that Savich fails to identify record evidence showing that, in reaching its decision, the BOA considered the relative timing of the enactments.